KERN v ST LUKE'S HOSPITAL ASSOCIATION OF SAGINAW

Docket No. 58939. Argued January 5, 1978 (Calendar No. 17).—Decided December 29, 1978. Rehearing denied 406 Mich 1103.

Alexis E. Kern and Larry Kern brought a medical malpractice action for negligence in diagnosis and treatment of their minor son Kyle, which resulted in irreversible brain damage to him, against St. Luke's Hospital Association of Saginaw, Hugh T. Caumartin, M.D., and other physicians. A jury in Saginaw Circuit Court, Eugene Snow Huff, J., returned a verdict of no cause of action. The Court of Appeals, Allen, P.J., and Papp, J. (D. E. Holbrook, Jr., J., concurring in result), affirmed in an unpublished per curiam opinion (Docket No. 21789). Plaintiffs argue that they were denied a fair trial on the grounds that (1) the cross-examination of their expert witnesses combined with defense counsel's argument to the jury to suggest that the plaintiffs' witnesses had conspired to present false testimony, (2) the interruption of the plaintiffs' argument to the jury by a person seeking emergency medical assistance and the fact that some of the jurors saw defendant physicians giving emergency medical treatment in a nearby courtroom may have influenced the jury in the defendants' favor, and (3) the trial court refused to instruct the jury that the defendant hospital was negligent as a matter of law in allowing its intern to provide emergency medical care to Kyle Kern without the supervision of a licensed physician. Plaintiffs appeal. *Held:*

1. Despite the zeal and persistence of defense counsel in their search for a conspiracy among plaintiffs' attorney, medical advisor, and expert witnesses to give collusive and untrue testimony, all that was revealed by cross-examination was that some of these physicians had known each other in the past, or presently knew each other casually or by reputation. Defense counsel did not abandon this strategy for want of a reasonable basis in evidence, but instead, during their argument to the

REFERENCES FOR POINTS IN HEADNOTES
[1] 75 Am Jur 2d, Trial §§ 193, 194.
[2, 4, 5] 31 Am Jur 2d, Expert and Opinion Evidence §§ 45, 46, 48.
  75 Am Jur 2d, Trial §§ 305, 306.
[3] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 19, 20.

jury, continued to inject this false issue. The record discloses that, by the time the jury retired to deliberate upon a verdict, defense counsel had succeeded in conveying the message that the plaintiffs would not have relied entirely on out-of-state physicians to testify for them had their case been meritorious.

2. Defense counsel's remarks concerning the plaintiffs' experts were not merely "breaches of good manners". They show a studied purpose to prejudice the jury and divert its attention from the merits of the case. One cannot be confident that the verdict in the instant case would have been the same had defense counsel not continuously raised the groundless charge, by direct attack and innuendo, that the "bought" testimony of plaintiffs' out-of-state expert witnesses was collusive and untrue. The accusation characterizing plaintiffs' witnesses as "professional experts" who made their living traveling around the country as a trio providing "bought" testimony, which had no basis in evidence, was so prejudicial as to require a new trial.

3. It is unnecessary to address the remaining two issues raised on appeal. The likelihood of a recurrence during a new trial of the type of interruption which occurred during the arguments of counsel is remote in the extreme.

4. The Court of Appeals properly disposed of the plaintiffs' argument that the hospital was negligent as a matter of law by deciding that interns working in a hospital are not "practicing medicine" as that term is used in the former medical licensing statute but are participating in a postgraduate training program. The fact that the completion of a one-year internship is itself a prerequisite to licensure negates a contrary ruling.

Reversed and remanded for a new trial.

Justice Ryan, with Justice Coleman concurring, would affirm the judgment of the Court of Appeals. The fact that the cross-examination of the plaintiffs' expert witnesses failed to produce evidence of a conspiracy does not constitute improper cross-examination or establish grounds for mistrial. Similarly, defense counsel's argument to the jury concerning the expert witnesses' testimony, while of doubtful legitimacy in referring to the witnesses as "those three cohorts" and bearing insinuations of debatable accuracy, was not on the whole so devoid of evidentiary support as to constitute prejudicial unfairness toward the plaintiffs.

### OPINION OF THE COURT

1. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT —
   EXPERT WITNESSES.
   Conveying to the jury in a trial for medical malpractice the

message through cross-examination and argument that the plaintiffs would not have relied entirely on out-of-state physicians to testify for them had their case been meritorious was improper and prejudicial.

2. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT — CREDIBILITY — EXPERT WITNESSES.

The accusation by defense counsel in a trial for medical malpractice characterizing the plaintiffs' expert witnesses as "professional experts" who made their living traveling around the country as a trio providing "bought" testimony, which had no basis in evidence, was so prejudicial as to require a new trial; the defense counsel's remarks to the jury concerning the plaintiffs' experts were not merely "breaches of good manners", but they show a studied purpose to prejudice the jury and divert its attention from the merits of the case.

3. PHYSICIANS AND SURGEONS — INTERNS — LICENSES — PRACTICING MEDICINE — MALPRACTICE.

Interns providing medical care in a hospital are not "practicing medicine" under the former medical licensing statute but are participating in a postgraduate training program (MCL 338.51 et seq.; MSA 14.531 et seq.).

DISSENTING OPINION BY RYAN, J.

4. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT — EXPERT WITNESSES.

*The fact that probing and challenging cross-examination of expert witnesses failed to produce evidence of a conspiracy to render untrue and collusive testimony, which apparently was counsel's purpose, does not constitute it improper cross-examination or establish grounds for mistrial.*

5. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT — EXPERT WITNESSES.

*An argument of defense counsel to the jury concerning the testimony of expert witnesses to the effect that the witnesses were "professional experts" who traveled around the country as a trio, while of doubtful legitimacy in referring to the witnesses as "those three cohorts" and bearing insinuations of debatable accuracy, is not a ground for a new trial where the argument was not on the whole so devoid of evidentiary support as to constitute prejudice toward the plaintiffs.*

*Leitson, Dean, Dean, Segar & Hart, P.C.,* for plaintiffs.

*Kitch & Suhrheinrich, P.C.* (by *Gregory G. Drutchas* and *Ronald E. Wagner),* for defendants St. Luke's Hospital Association of Saginaw and James L. Adams, M.D.

*Cline & Cline* for defendants Hugh Caumartin, M.D., Robert M. Heavenrich, M.D., Rudolph M. Jarvi, M.D., William G. Mason, M.D., and J. Eugene Rank, M.D.

*Mainolfi, McGraw & Borchard* for defendant William T. Rice, M.D.

Amicus Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Stuart M. Lockman)* for Michigan Hospital Association.

FITZGERALD, J. Plaintiffs in this malpractice case appeal from a jury verdict of no cause of action against defendants. Three issues are raised by plaintiffs' application for leave to appeal:

1) Whether the conduct of defendants' counsel, in interjecting improper innuendos of a conspiracy between plaintiffs' counsel and expert witnesses to render untrue and collusive testimony, deprived plaintiffs of a fair trial and required granting of a mistrial or a new trial.

2) Whether the sudden interruption of plaintiffs' counsel's closing argument by someone seeking emergency medical attention from defendant physicians, and the subsequent viewing by some of the jurors of defendant physicians' administering medical treatment to a woman lying on the floor of a nearby courtroom resulted in denial to plaintiffs of

a fair trial and required the granting of a mistrial or a new trial.

3) Whether the trial court committed reversible error by refusing to instruct the jury that defendant hospital was negligent as a matter of law in allowing an intern, not licensed to practice medicine in Michigan, to provide medical care.

The Court of Appeals answered these questions in the negative and affirmed the jury verdict of no cause of action. We disagree on the first issue and reverse.

## I. FACTS

Plaintiffs in this medical malpractice case are the parents and guardian of a now permanently and irreversibly brain-damaged child, Kyle Kern. Defendants are the hospital and physicians who took part in the child's care when he was brought to them for diagnosis and treatment.

On August 14, 1969, Kyle, whose age was then 14 months, became sick at his stomach and began to vomit. The child's father came home from work around 6 p.m., and his mother called defendant firm of pediatricians. One of the firm's physician employees advised Mrs. Kern to take the child to St. Luke's Hospital emergency room.

At the hospital emergency room the child was examined by defendant Dr. James Adams, a medical school graduate who had just begun his internship in July of 1969. Dr. Adams took a history of the child which indicated that the child had been vomiting repeatedly with the vomitus becoming greenish. Dr. Adams performed an examination of the child and concluded that the child had gastroenteritis, an irritation of the stomach and intestines. The child was given a Compazine supposi-

tory and prescribed a light diet of skim milk and baby aspirin every four hours.

Mr. and Mrs. Kern took their child home, and the child slept in their room throughout the night. When Mr. Kern got up and went to work at 7 a.m. on the following day, the child was still sleeping. However, at 11 a.m., after being fed some skim milk, the child began vomiting again. Mrs. Kern called defendant firm of pediatricians and received further dietary instructions. In a later call, made after the child could not keep down either skim milk or cola, Mrs. Kern was told to bring the child to the pediatricians' office. He was there examined by defendant Dr. Jarvi and defendant Dr. Heavenrich. A mass seemed to be present in the child's abdomen, and a possible bowel blockage by intussusception[1] was diagnosed. Arrangements were then made for the child's immediate admission to the hospital.

At the time of admission, the admitting intern, Dr. James O'Brien, had a telephone consultation with Dr. Jarvi and sent Kyle to St. Luke's Department of Radiology for a barium enema. The barium enema and X-rays were done by defendant Dr. Caumartin. Dr. Caumartin felt an abdominal mass before the barium enema but could not detect a mass afterwards. The X-rays and barium enema did not indicate an intussusception or bowel blockage, although Dr. Caumartin saw a small rounded shadow which he perceived to be a polyp.[2] Dr. Caumartin reported these findings by telephone to Dr. Jarvi.

---

[1] A blockage caused by a telescoping of the bowel or intestine.

[2] "[A] general, descriptive term used with reference to any mass of tissue that bulges or projects outward, or upward, from the normal surface level, thereby being macroscopically visible as a hemispheroidal, spheroidal, or irregularly mound-like structure growing from a relatively broad base or a slender stalk." Stedman's Medical Dictionary, (4th lawyer's ed), p 1120.

On the evening of August 15, 1969, Dr. Jarvi visited Kyle in the hospital and brought in defendant Dr. Rice, a surgeon, to join in the child's care. Dr. Rice felt a round mass in the child's abdomen and recommended that the barium enema be repeated.

On the following morning, Saturday, August 16, 1969, Dr. Rice found that the barium enema had not been repeated, but due to what he perceived to be the child's improved condition, he no longer thought it was necessary. However, Mr. and Mrs. Kern testified that they were at the hospital from 11 a.m. to 7 p.m. on Saturday and that the child was listless, sick, and vomiting. Kyle's parents further testified that during this eight-hour period, their son was not seen by a physician. Dr. Rice indicated that he thought he saw the child on Saturday night, when he performed an appendectomy at St. Luke's Hospital, but the hospital's operating room records showed that no such surgery was performed on the evening of August 16, 1969.

On Sunday morning, Kyle's condition became worse, and at noon Dr. Rice operated. He found a bowel blockage by intussusception with about six inches of intestine gangrenous, which he removed and then rejoined the bowel. Kyle's postoperative recovery appeared to be normal, and his parents went home, but were called back when the child's temperature became extremely high due to the gangrene. As a result, Kyle suffered permanent and irreversible brain damage and is now totally disabled.

Plaintiffs filed suit against defendants claiming that defendants were negligent in not diagnosing and treating Kyle in a timely manner and that such negligence was the cause of Kyle's permanent

and irreversible brain damage. During the trial, which lasted from May 29, 1974 to June 26, 1974, plaintiffs introduced testimony of two physicians from Philadelphia and one physician from New York to support their claim that defendants failed to diagnose and treat the bowel blockage in a timely manner. A fourth physician, Dr. Feltoon, assisted plaintiffs in the preparation of the case, but was not called as a witness. Defendants' experts, who were from Saginaw, Midland and Detroit, testified that there was no negligence in the diagnosis and treatment. The jury returned a verdict of no cause of action. On September 17, 1974, the trial court denied plaintiffs' motion for a new trial. The Court of Appeals affirmed on August 25, 1976 (unpublished per curiam, Docket No. 21789). Leave to appeal was granted by this Court on April 29, 1977. 399 Mich 893 (1977).

## II. ISSUES

Plaintiffs argue that they were denied a fair trial by the conduct of defendants' counsel in interjecting improper innuendos, not based in the evidence, of a conspiracy between plaintiffs' counsel and expert witnesses to render untrue and collusive testimony. The Court of Appeals held that in view of the length of the trial and the volume of the record (almost 2,500 pages), the remarks about which plaintiffs complain did not constitute reversible error. We disagree.

Throughout the trial defendants' counsel attempted to show that plaintiffs' counsel and plaintiffs' medical advisor, Dr. Feltoon, had conspired with three out-of-state physicians to provide "bought and paid for" testimony.

Defendants' counsel repetitively probed for evi-

dence of a conspiracy to render untrue and collusive testimony during cross-examination of plaintiffs' experts, but were unable to elicit any such evidence.

On May 31, 1974, the third day of the trial, plaintiffs called the first of their three medical experts, Dr. Kaplan, a neurologist from New York City. On cross-examination, Dr. Kaplan was questioned as follows:

"*Q.* Is this the first time you had met Mr. Dean was a conference in New York?

"*A.* Yes.

"*Q.* How did Mr. Dean happen to come to you?

"*A.* Originally?

"*Q.* Yes.

"*A.* I have no idea, I think you better ask him.

"*Q.* I would like to ask you.

"*A.* I don't know.

"*Q.* Did you inquire of him out of all the neurologists in the world he happened to walk into your office in New York City?

"*A.* I did ask him—I may have asked him, I don't recall. Sometime ago. I will say this, that I have seen over the past 25 years a large number of problems that have medical-legal aspects in terms of injuries to the nervous system.

"I am a consultant for the City of New York in this kind of problem although I don't know if that has anything to do with it.

"*Q.* We will get into your medical-legal experience, Doctor.

"Did anyone else contact you before Mr. Dean contacted you to arrange this conference with Mr. Dean?

"*A.* Not that I recall, not that I recall.

"*Q.* Did Mr. Dean call you personally to ask for an appointment or did he merely call your nurse or receptionist and ask for an appointment?

"*A.* I don't recall that. I think perhaps most likely he spoke to me initially to discuss the case and problems

and whether I would be willing to review the medical records.

"That is usually what might happen. This is not the first time I reviewed medical records of problems.

"I think thereafter on the basis of my review of the medical records arrangements were made to examine the child.

"*Q.* Do you know when you had this conference with Mr. Dean?

"*A.* I don't recall the exact date, I don't have it here, but within the last two or three months.

"*Q.* Is the first time you had a conference with Mr. Dean?

"*A.* A physical confrontation, yes.

"*Q.* Yes?

"*A.* That's correct.

"*Q.* Have you talked to any other medical personnel about this case before meeting with Mr. Dean?

"*A.* No, sir.

"*Q.* I notice you discussing something with a gentleman in the back, do you know who that is?

"*A.* Dr. Feltoon. I met him last night.

"*Q.* Dr. Feltoon?

"*A.* Yes.

"*Q.* You did not know Dr. Feltoon before?

"*A.* Before last evening?

"*Q.* Last night.

"*A.* No.

"*Q.* Did you stay in one of the local motels?

"*A.* I did, at the Holiday Inn East, I think it is.

"*Q.* Dr. Feltoon stayed at that motel?

"*A.* I believe so, yes."

After detailed questioning about the amount of testimony Dr. Kaplan had provided in malpractice cases and his experience in medical-legal matters, defense counsel returned to the subject as follows:

"*Q.* Doctor, once again, you have no idea how Mr. Dean happened to contact you?

"*A.* No, I don't."

On the next day of trial, plaintiffs' counsel, anticipating a continuation of this defense strategy, sought to confine defense counsel to proper impeachment questions and moved in chambers that "counsel for the defense be instructed not to ask irrelevant and immaterial questions regarding the relationship of the plaintiffs' expert witnesses, namely Dr. Chodoff and Dr. Edeiken, as to any—in such a way as to reflect any impropriety or conspiracy or improper actions; that Dr. Feltoon is not going to be with us *[sic,* a witness] in this case". The court reserved ruling on this objection and allowed defendants' counsel to continue along their line of inquiry.

On the same day plaintiffs presented the testimony of Dr. Chodoff, a general surgeon from Philadelphia. On cross-examination defense counsel continued their inquiry as follows:

"*Q.* Doctor, when did you first receive notification of this lawsuit?

"*A.* Couple years ago, I don't remember the exact date.

"*Q.* How did you become aware of this lawsuit?

"*A.* Frankly, I do not remember now, it has been so long ago, I think Mr. Dean contacted me but I am not 100 percent certain.

"*Q.* How did it happen Mr. Dean contacted you?

"*The Court:* If you know.

"*A.* If I know, no, I don't know. I can speculate, but I don't know.

"*Q.* Has he contacted you in the past?

"*A.* No.

"*Q.* This was the first time he had ever contacted you?

"*A.* Yes, sir.

"*Q.* Do you know Dr. Feltoon?

"*A*. Yes, sir.

"*Q*. Have you worked with Dr. Feltoon on numerous malpractice lawsuits?

"*A*. No, I know him socially.

"*Q*. You know him socially?

"*A*. Yes, sir.

"*Q*. Might it be Dr. Feltoon arranged for you to meet with Mr. Dean?

"*A*. As I said, I don't know, it may be possible.

"*Q*. You have no memory one way or the other?

"*A*. No, I haven't, really, it's too long ago.

"*Q*. Two years ago?

"*A*. At least two years ago."

It is clear that despite the zeal and persistence of defense counsel in their search for a conspiracy among plaintiffs' attorney, medical advisor, and expert witnesses to render collusive and untrue testimony, all that was revealed by cross-examination was that some of these physicians had known each other in the past or presently knew each other casually or by reputation. However, defense counsel did not abandon this strategy for want of a reasonable basis in evidence, but instead, during their final argument, continued to inject this false issue for the jury's consideration.

Returning to the question of why plaintiffs had happened to consult with Dr. Kaplan, defense counsel rhetorically asked:

"How did Mr. Dean find you, of all the neurologists in the United States; of all the neurologists in Grand Rapids, in Detroit, Highland Park, any place in Michigan, any place in the United States? How did Mr. Dean suddenly call up one day, on Sixth Avenue in New York City, and say, 'Dr. Kaplan, come testify for me, come examine this baby. Don't do a darned thing for the baby; don't talk to the doctor, don't find out what's

being done for him, just get on that stand and say the
baby is going to live forever.'

"I asked him, and I made this big gesture (indicating)
'How in the whole world did Mr. Dean know to call
you,' and his answer was, 'I don't know. Ask Mr.
Dean.' "

In reference to Dr. Edeiken's testimony, defense
counsel stated:

"Now, first of all, why did he come here? He's head of
the Department of Radiology. He's the Chief of the
Department. This isn't his field of radiology, although
he is a competent, trained radiologist.

"He says, 'In my hospital we have a specific pedia-
trics radiologist who does this kind of thing.' Well, if
he's the Chief, if he's the head, and he really thought
something was wrong or that pediatric radiologist—why
didn't he tell that pediatric radiologist to come on
down? Maybe it has something to do with the strange
Dr. Feltoon in the courtroom, his social friend who he
went to medical school with; the same Dr. Feltoon that
Dr. Chodoff knew."

Defense counsel also referred to plaintiffs' expert
medical witnesses as "those three cohorts" who
had come to court to testify against their clients.
Similarly, defense counsel referred to plaintiffs'
expert Dr. Chodoff as "the fellow that came in
here to do my client in. That's kind of blunt but
that's what he is here for. * * * Now I'm not going
to knock anybody but he came all the way here
from Philadelphia to do Dr. Rice in * * * ."

After defendants' closing argument, plaintiffs'
counsel moved for a mistrial because of defense
counsel's reference to the "strange Dr. Feltoon", or
in the alternative a curative instruction. In declin-
ing to grant a mistrial, the court stated:

*"The Court:* Yes, I'm doubtful that that's legitimate argument to a jury. To permit a jury to speculate on something like that would, in the opinion of the court, be improper, but I'll let you answer it any way you like.

"If you had objected at the time, the court could have ruled on it at that time and told the jury to disregard it. To revive it at this stage of the proceedings is, in the opinion of the court, not necessary or warranted by the circumstances."

During his final summation, plaintiffs' counsel attempted to respond to the unsubstantiated insinuations of defense counsel relating to the testimony of out-of-state physicians by discussing the difficulty in obtaining the assistance of local physicians in the preparation of a malpractice case. Defense counsel objected to plaintiffs' counsel arguing the "conspiracy of silence" on the basis that there was no evidence in the record of such a conspiracy.[3] The court agreed, stating that it "would not permit an argument of that kind".

The record discloses that, by the time the jury retired to deliberate upon a verdict, defendants' counsel had succeeded in conveying the message that plaintiffs would not have relied entirely on out-of-state physicians to testify for them had their case been a meritorious one.

In *Wayne County Board of Road Commissioners v GLS LeasCo,* 394 Mich 126; 229 NW2d 797 (1975), a condemnation case involving a similar "battle of experts", this Court reversed a verdict for plaintiff upon finding that the improper con-

---

[3] It is interesting that in response to the suggestion that defense counsel had indirectly raised the issue of "conspiracy of silence", defense counsel stated:

"No, I didn't; I didn't. What I argued was the fact that these guys were bought-and-paid-for witnesses that ran around in a group and testified all over the country. That's why I said, 'Who are these guys?' Not that he couldn't get anybody from any place else."

duct of plaintiff's counsel, in attacking defendant's witnesses by "innuendo and unfounded accusation" of rendering collusive and untrue testimony, had deprived defendant of a fair trial on the merits. With respect to plaintiff Wayne County's strategy of attacking defendant's expert witnesses, this Court stated:

"These comments represent more than the mere reproof of recalcitrant witnesses. They constitute unjustified, direct attacks on the integrity and honesty of LeasCo's witnesses. There is no evidence that these witnesses testified falsely, withheld information when stating that they did not know the answer to counsel's questions, or manufactured false evidence.

"Witnesses should not be subjected to personal attacks and unsubstantiated insinuations. Each party is entitled to present its case on the merits, free from remarks of opposing counsel which may prejudice the jury and divert its attention from the real issues." 394 Mich 126, 134.

Defendants rely on *Firchau v Foster,* 371 Mich 75; 123 NW2d 151 (1963), which involved an appeal from a trial court's refusal to grant a new trial because plaintiff's counsel had referred to defendant as a "leech and a parasite", to support their argument that their remarks concerning plaintiffs' experts were within the limits of proper argument. However, we find that defendants' reliance on *Firchau* is misplaced. While this Court acknowledged that "common experience seems to be that such breaches of good manners are more detrimental to the actor than the accused", we went on to say:

" 'Counsel may, acting on their own judgment as to propriety and good taste, discuss the character of witnesses, the probability of the truth of testimony given

on the stand, and may, *when there is any reasonable basis for it,* characterize testimony.' [Citation omitted.]

"But where language is such as evinces a *studied purpose to inflame or prejudice the jury, based upon facts not in the case,* this Court has not hesitated to reverse." 371 Mich 75, 78-79. (Emphasis added.)

In the instant case, we do not view defendants' remarks concerning plaintiffs' experts as being merely "breaches of good manners"; we perceive a studied purpose to prejudice the jury and divert the jurors' attention from the merits of the case.[4]

We are not confident that the verdict in the case at bar would have been the same had defendants' counsel not continuously raised the groundless charge, by direct attack and innuendo, that the "bought" testimony of plaintiffs' out-of-state expert witnesses was collusive and untrue. In a case as close and sharply contested as the instant one, we cannot believe that plaintiffs had a fair trial where defendants' counsel succeeded in characterizing plaintiffs' witnesses as "professional experts" who made their living traveling around the country as a trio providing "bought" testimony. We find that this accusation, which had no basis in evidence, was so prejudicial as to require a new trial.

Since we reverse and remand for a new trial on the basis of the first issue raised by plaintiffs, we find it unnecessary to address the issue of whether the sudden interruption of plaintiffs' closing argument by a person seeking emergency medical treatment denied plaintiffs a fair trial. The likelihood of a recurrence during a new trial of the type

---

[4] That the studied injection of a false issue to prejudice the jury may require a new trial, see, also, *Morrison v Skeels,* 16 Mich App 727; 168 NW2d 644 (1969); *Lapasinskas v Quick,* 17 Mich App 733; 170 NW2d 318 (1969); and *Kakligian v Henry Ford Hospital,* 48 Mich App 325; 210 NW2d 463 (1973) (opinion of V. J. BRENNAN, J.).

of interruption which was visited upon the trial proceedings is remote in the extreme.

The last issue on appeal is whether the trial court committed reversible error by refusing to instruct the jury that defendant hospital was negligent as a matter of law in allowing an intern, not licensed to practice medicine, to provide medical care. The Court of Appeals held that an intern working in a hospital emergency room is not "practicing medicine" within the meaning of the then-applicable medical licensing statute,[5] but is participating in a postgraduate training program.[6] We agree. The fact that the completion of a one-year internship is itself a prerequisite to licensure negates a contrary ruling.

We reverse and remand for a new trial. Costs to plaintiffs.

KAVANAGH, WILLIAMS, LEVIN, and BLAIR MOODY, JR., JJ., concurred with FITZGERALD, J.

RYAN, J. *(dissenting)*. I do not share my colleagues' conviction that either defense counsel's cross-examination of Dr. Kaplan or Dr. Chodoff or counsel's argument in summation to the jury warrant setting aside the jury's verdict in this case.

The probing and challenging cross-examination of Drs. Kaplan and Chodoff failed to produce evidence of "a conspiracy * * * to render untrue and collusive testimony", which apparently was counsel's purpose. That the effort failed, however, does not constitute it improper cross-examination or establish grounds for mistrial.

---

[5] 1899 PA 237; MCL 338.51 *et seq.;* MSA 14.531 *et seq.* was repealed by 1973 PA 185; MCL 338.1801 *et seq.;* MSA 14.542(1) *et seq.*

[6] See *Rush v Akron General Hospital,* 84 Ohio L Abs 292; 171 NE2d 378 (Ct App, 1957), which held that interns working in hospitals are not in violation of the state's medical licensing statute.

Similarly, defense counsel's argument to the jury concerning the testimony of Drs. Kaplan, Chodoff and Edeiken while of doubtful legitimacy in referring to the witnesses as "those three cohorts" and bearing insinuations of debatable accuracy was not on the whole so devoid of evidentiary support as to constitute prejudicial unfairness toward the plaintiffs.

I would affirm the Court of Appeals.

COLEMAN, J., concurred with RYAN, J.