WISCHMEYER v SCHANZ

WISCHMEYER v ST MARY'S MEDICAL CENTER

Docket Nos. 99129, 99139. Argued April 5, 1995 (Calendar No. 15).
Decided August 10, 1995.

Wade W. and Judy Wischmeyer brought a medical malpractice
action in the Saginaw Circuit Court against George P. Schanz,
M.D., and St. Mary's Medical Center, alleging negligence and
breach of the applicable standard of care during back surgery
performed by Dr. Schanz on Wade, failure by St. Mary's to
provide a qualified neurosurgeon to assist Dr. Schanz, and
negligence on the part of an operating room technician. The
court, Lynda L. Heathscott, J., entered judgment on a jury
verdict of no cause of action with respect to both defendants.
The Court of Appeals, MICHAEL J. KELLY, P.J., and SHEPHERD
and MURPHY, JJ., reversed in an opinion per curiam, holding
that the court abused its discretion by allowing cross-examina-
tion of the plaintiff's expert witness regarding prior poor
surgical results and medical malpractice claims (Docket No.
135291). The defendants appeal.

In an opinion by Justice WEAVER, joined by Chief Justice
BRICKLEY, and Justices BOYLE and RILEY, the Supreme Court
held:

The trial court did not abuse its discretion by allowing cross-
examination of the plaintiff's expert witness.

1. A broad range of evidence may be elicited on cross-exami-
nation to discredit a witness. The scope and duration of cross-
examination is in the trial court's sound discretion and will not
be reversed absent a clear showing of abuse. When a case turns
on the testimony of one expert compared with that of another,
the credibility of each expert is relevant to the disposition of
the case and generally is admissible unless its probative value
is substantially outweighed by the danger of unfair prejudice.

2. In this case, the trial court correctly permitted defense
counsel to question the plaintiff's expert regarding prior back
surgeries he had performed because those surgeries were rele-
vant to his competency. Gaps or weaknesses in a witness'
expertise are a fit subject for cross-examination and go to the
weight of the testimony, not its admissibility. Because expert

testimony is admitted to assist the trier of fact, it was imperative that opposing counsel in this case be afforded an opportunity to cross-examine to expose weakness in the witness' knowledge, skill, experience, training, or education. Further, the line of questioning was not more prejudicial than probative. Evidence does not present a danger of unfair prejudice unless it threatens the fundamental goals of MRE 401 and MRE 403: accuracy and fairness.

3. While prior failed back surgeries are relevant to the competency of an expert witness, the mere fact that this expert may have been named in an unrelated medical malpractice action is not probative of his truthfulness under MRE 608 or relevant to his competency or knowledge. Thus, it was improper for the defendant to inquire into the unrelated action. However, the error was harmless. By the time the question was raised, the expert had been thoroughly discredited. Further, the plaintiff did not object to this line of questioning, nor did he specifically raise the issue in his motion for mistrial. The Court of Appeals also failed to adequately distinguish between cross-examination regarding prior poor results in back surgeries and medical malpractice cases. Under MRE 103, unpreserved error is reviewed and reversed only if the substantial rights of a party are affected. Here no substantial rights of the plaintiff were affected by this line of cross-examination.

4. In a medical malpractice case, the plaintiff bears the burden of proving the applicable standard of care, breach of that standard by the defendant, injury, and the proximate causation between the alleged breach and the injury. Furthermore, evidence of a bad result alone is not sufficient to prevail under the theory of res ipsa loquitur. In this case, the plaintiff did not establish a prima facie case under either of his theories of recovery. The Court of Appeals failed to distinguish its reasoning for reversal of the verdict of no cause of action with respect to St. Mary's Medical Center from its reversal of the verdict with respect to Dr. Schanz. The plaintiff's theories against each defendant were separate and distinct, and it is apparent that the plaintiff failed to carry the burden of proof against St. Mary's.

Reversed.

Justice LEVIN, joined by Justices CAVANAGH and MALLETT, dissenting, stated that a medical expert should not be questioned about past medical malpractice litigation arising out of allegedly failed operations because it is not relevant to the expert's competency or knowledge as a witness. In concluding that the trial judge did not abuse her discretion in allowing

impeachment of the plaintiff's expert by allegations of bad surgical results, the majority ignores facts that made this line of questioning especially misleading and unfair to the plaintiff. Even without these omissions, the questioning was violative of MRE 608(b). In addition, its conclusion that the medical malpractice impeachment was harmless error is not persuasive.

Under Rule 608(b), a witness may not be impeached by an inquiry into specific past acts unless the court finds that those acts reflect the witness' character for truthfulness. The allegations of prior surgical mishaps by the plaintiff's expert had nothing to do with his truthfulness. The cross-examination of the expert also would have been improper under the common law. The alleged acts of negligence were unrelated to the subject of his testimony. The risk of unfairly prejudicing the jurors against the expert, as well as the risk of confusion of and distraction from issues, substantially outweighed whatever slight relevance the questioning had in evaluating the expert's testimony.

The majority's ruling that the error in permitting cross-examination concerning past medical malpractice litigation was harmless is based on an incomplete, and thus inaccurate, characterization of the trial testimony. The expert's inability to improve his patient's conditions does not call into question his knowledge of the standard of care. The trial court exacerbated the error in permitting the cross-examination by its disparate treatment of the parties on the issue.

203 Mich App 361; 512 NW2d 82 (1994) reversed.

*Mark Granzotto, Philip F. Maher,* and *Arthur A. Borella* for the plaintiffs.

*Thomas C. Wimsatt* for St. Mary's Medical Center.

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C.,* of counsel (by *John P. Jacobs*), for George P. Schanz, M.D., and George P. Schanz, M.D., P.C.

WEAVER, J. We granted leave[1] to appeal in this medical malpractice case to clarify the permissible scope of cross-examination of expert witnesses. The

[1] 447 Mich 1041 (1994).

Court of Appeals reversed a jury verdict of no cause of action against defendants Dr. George P. Schanz and St. Mary's Medical Center. The Court of Appeals held that the trial court abused its discretion by allowing cross-examination of plaintiff's expert witness regarding that expert's prior poor surgical results and prior medical malpractice claims.[2] We reverse the decision of the Court of Appeals and reinstate the verdict of no cause of action for Dr. Schanz and St. Mary's Medical Center.

I

FACTS

In August 1984, plaintiff Wade W. Wischmeyer injured his back in a fall. He consulted with several doctors over the following months.[3] In January 1985, he consulted with defendant, a neurosurgeon in private practice in Saginaw with medical privileges at defendant hospital, St. Mary's Medical Center. On May 29, 1985, Dr. Schanz admitted plaintiff to St. Mary's Medical Center, and on the following day performed a L4-L5 diskectomy with a posterior lumbar interbody fusion (PLIF).[4] During surgery, two St. Mary's operat-

[2] 203 Mich App 361; 512 NW2d 82 (1994).

[3] After the fall, plaintiff consulted with Dr. Gruca, who treated plaintiff with medication on an out-patient basis. In November 1984, plaintiff consulted Dr. Jennings, whose video deposition was presented at trial. Dr. Jennings indicated to plaintiff that surgery would be required to alleviate plaintiff's pain. For a second opinion, plaintiff consulted with Dr. Fields in January 1985. Dr. Fields, indicated that a type of fusion surgery would be necessary to relieve the pain, rather than a diskectomy or laminectomy, and he therefore referred plaintiff to defendant, Dr. Schanz who specialized in part in fusion surgeries.

[4] A PLIF is a surgical procedure that stabilizes the spine by the insertion of bone plugs between vertebrae. Apparently, after disc has been removed by a standard diskectomy, a PLIF combines the medical procedure of a laminectomy, the cutting of a window in the bone, with the fusion of the bone plugs between vertebrae in vacated disc space.

ing room technicians, Mark Nichols and Leah Lowery, assisted Dr. Schanz. Plaintiff alleges that soon after surgery his pain worsened and he experienced numbness in his right leg.

Plaintiff and his wife[5] brought this action for medical malpractice in the Saginaw Circuit Court on May 29, 1987, alleging that Dr. Schanz breached the standard of care in his treatment of plaintiff and that his injury would not have occurred absent some negligence on the part of Dr. Schanz.[6] Against St. Mary's, plaintiff raised two theories: first, that St. Mary's failed to provide a qualified neurosurgeon to assist Dr. Schanz, and second, that Mark Nichols, the operating room technician, was negligent.

Each party relied on expert testimony to establish the appropriate standards of care. Defense counsel for Dr. Schanz called two medical experts who testified that there was no malpractice on the part of Dr. Schanz. Defense counsel for St. Mary's Medical Center called one expert who testified that there was no negligence on the part of St. Mary's employees.

The testimony of plaintiff's only medical expert, Dr. Ronald J. Ignelzi, consumes two hundred pages of the record. On direct examination, Dr. Ignelzi outlined his credentials at length and explained that he had performed six to ten PLIFs, the type of surgery performed by Dr. Schanz on plaintiff, and that he had performed hundreds of other spinal surgeries. He explained in detail how various surgeries should be performed and concluded that Dr. Schanz performed the wrong procedure on plaintiff and had performed the procedure itself incorrectly. He stated that plaintiff's symptoms "should

[5] Mrs. Wischmeyer claimed loss of consortium.

[6] Plaintiff alleged that the fusion procedure was unnecessary and more invasive than necessary.

not have occurred unless there was some negligence at the time of the procedure."

On cross-examination, Dr. Ignelzi acknowledged that none of the PLIF surgeries he had performed had been successful because he had failed to relieve his patients' pain. However, he denied remembering four other back surgeries that failed, including three failed laminectomies and one failed dorsal rhizotomy. Plaintiff's counsel objected to the relevancy and prejudicial nature of raising non-PLIF surgeries, but was overruled. Dr. Ignelzi also denied that he had been the subject of a prior medical malpractice action.

The jury trial spanned two weeks. After deliberating for less than one hour, the jury returned a verdict of no cause of action with respect to both defendants. On appeal, plaintiff alleged that the trial court abused its discretion by permitting certain categories of cross-examination to proceed.

## II

### CROSS-EXAMINATION

Rule 611(b) of the Michigan Rules of Evidence states:

> A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. The judge may limit cross-examination with respect to matters not testified to on direct examination.

A broad range of evidence may be elicited on cross-examination for the purpose of discrediting a witness.[7] The scope and duration of cross-examination is in the trial court's sound discretion; we will

---

[7] *Wilson v Stilwill*, 411 Mich 587, 599; 309 NW2d 898 (1981). See also 3A Wigmore, Evidence (Chadbourn rev), § 944, p 778.

not reverse absent a clear showing of abuse.[8] The trial judge is charged with overseeing attacks on an expert's credibility and insuring that

> questions seeking to elicit evidence indicating bias, prejudice or interest and inconsistent testimony or statements are not unduly limited or improvidently extended. The trial judge must also be alert to questions which harass, intimidate or belittle a witness.[9]

However, when a case turns on the testimony of one expert compared with that of another, the credibility of each expert is relevant to the disposition of the case.[10] The credibility of a medical expert, therefore, is relevant to the disposition of a medical malpractice case and evidence of an expert's credibility generally is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice.[11]

We must address two categories of testimony elicited by the defense during its cross-examination of Dr. Ignelzi: prior poor surgical results in non-PLIF back surgeries and prior claims of medical malpractice against him. These categories of evidence are addressed separately below.

[8] *Stilwill,* n 7 *supra* at 599.

[9] *Id.*

[10] *Id.*

[11] MRE 401 states:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

MRE 403 states in pertinent part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .

A

PRIOR POOR NON-PLIF SURGICAL RESULTS

On cross-examination, defense counsel questioned Dr. Ignelzi regarding back surgeries the doctor had performed in the past. Plaintiff's counsel entered an objection on unspecified grounds as the cross-examination regarding prior failed surgeries began, but was overruled after a bench conference. The questioning by defense counsel proceeded as follows:

*Q.* Doctor, do you recall in 1980 performing surgery on a lady named Cynthia Hughes where you performed a laminectomy and the dura was ripped in a fashion and she was later discharged with the spinal fluid leaking?
*A.* No, I don't.
*Q.* You don't recall that?
*A.* No.
*Q.* Certainly something like that would be so horrible that you wouldn't forget it, would you?
*A.* I don't know what you mean by horrible, but I mean I don't recall this case.
*Q.* Do you recall in May of 1979 performing surgery on an individual by the name of Rodgers who underwent a cervical laminectomy and developed a Brown-Sequard syndrome postoperatively?

Counsel for plaintiff objected to the relevancy and prejudicial effect of this questioning, but was overruled.

*Q.* Do you recall that, where you cut into the spinal cord?
*A.* What was that again?
*Q.* In May of 1979 do you recall performing a lamin- —a cervical laminectomy on a gentleman

by the name of Rodgers where he developed a
Brown-Sequard syndrome postoperatively?

*    *    *

Q. Do you recall in January of 1979 surgery
performed upon a Mr. Jack Rodgers who under-
went a dorsal rhizotomy and wound up a para-
plegic following the operation secondary to a he-
matoma?

A. No.

Q. You don't recall that?

A. No.

Again, plaintiff's counsel initiated a bench confer-
ence, followed by:

Q. Do you recall performing surgery on a Mr.
Eric Woods in August of 1977 who underwent a
laminectomy and wound up with a wound infec-
tion and postoperative epidural hematoma which
resulted in paraplegia?

A. No.

Q. Do you remember that case of yours?

A. I don't even know that that was a case of
mine.

There is some confusion regarding whether
plaintiff's objections arose under MRE 608(b)[12] or
MRE 403. We find that both rules were correctly
considered and decided by the trial court. The
court permitted inquiry into prior non-PLIF surger-
ies because it felt that those surgeries were rele-

___

[12] MRE 608(b) states in pertinent part:

Specific instances of the conduct of a witness, for the purpose
of attacking or supporting his credibility, other than conviction
of crime as provided by Rule 609, may not be proved by
extrinsic evidence. They may, however, in the discretion of the
court, if probative of truthfulness or untruthfulness, be in-
quired into on cross-examination of the witness . . . .

vant to the expert's competency.[13] We agree. Further, the court appropriately disallowed impeachment of Dr. Ignelzi on extrinsic matters under MRE 608(b), stating that defendant would be "stuck with" Dr. Ignelzi's answer.[14] At the conclusion of Dr. Ignelzi's cross-examination, the trial court properly denied plaintiff's motion for a mistrial, again holding that the cross-examination did not violate MRE 608(b).[15]

The Court of Appeals disagreed with the trial court's rulings, citing *Heshelman v Lombardi,* 183

---

[13] When defense counsel asked if he could inquire into prior surgeries performed by Dr. Ignelzi, Judge Heathscott stated:

   I would think that would go to his qualifications, and I would think so.

[14] The court stated:

   In reviewing the documents submitted by Mr. Fordney last night, I have also reviewed the Michigan Rules of Evidence, and I believe that Rule 608(b) is applicable to this situation. I am not going to allow impeachment of Dr. Ignelzi on a collateral matter, and I'm not going to allow extrinsic evidence. However, I do believe that Mr. Fordney will have the right to ask if the doctor has been terminated from hospital privileges anywhere, but you're going to be stuck with the answer. I'm not going to allow you to go into any collateral matters, Mr. Fordney. I'm not going to allow you to use any of these documents, but you may ask if he's been terminated from any privileges.

The extrinsic evidence and collateral matters referenced by the court involved certain federal court cases for which Dr. Ignelzi was under a gag order.

[15] Judge Heathscott stated:

   Mr. Maher, I'm not going to grant a mistrial . . . . Under 608(b), Mr. Fordney can cross examine about specific instances of conduct which he has done. He then must accept the answer of the doctor, and I believe that has been complied with. . . . I understand your disagreeing with the suits being mentioned at all, but I want you specifically to address whether Mr. Fordney used extrinsic evidence to prove these specific instances of conduct in violation of my order.

Mich App 72; 454 NW2d 603 (1990).[16] However, *Heshelman* is not in conflict with the trial court's ruling.[17] In this case, Dr. Ignelzi testified that defendant should have undertaken a more conservative course of treatment, implying that a more conservative treatment would have prevented plaintiff's injuries. Through this testimony, he placed his competency to condemn defendant in question. The cross-examination of Dr. Ignelzi regarding prior poor surgical results, therefore, did not raise extrinsic evidence prohibited by MRE 608. Because the competency of Dr. Ignelzi was properly before the court, evidence pertaining to his credibility was relevant.

It is intended that the Rules of Evidence promote the ascertainment of the truth.[18] Where information is relevant and not unduly prejudicial,

---

[16] The Court of Appeals stated in relevant part:

The trial court abused its discretion in allowing defense counsel to cross-examine plaintiffs' expert witness, Dr. Ignelzi, regarding prior poor surgical results and prior medical malpractice claims. *Heshelman v Lombardi,* 183 Mich App 72; 454 NW2d 603 (1990). This line of questioning was not probative of truthfulness or untruthfulness, and constituted an improper means of impeaching the credibility of Dr. Ignelzi. *Id.* at 84-85. The cross-examination of plaintiffs' expert on this basis cannot be considered harmless error. *Heshelman, supra.* The questions raised unproved accusations of acts of malpractice in graphic detail and, we believe, thoroughly discredited Dr. Ignelzi before the jury. [203 Mich App 362.]

[17] *Heshelman v Lombardi, supra.*
*Heshelman* addressed the admissibility of prior medical malpractice actions. As will be discussed in part II(B), prior malpractice actions are not generally relevant to the competency of an expert.

[18] MRE 102 states:

These rules are intended to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

it would be unwise to apply MRE 608 so that the jury is deprived of information that would assist it in its task. We believe that this cross-examination was proper because during direct examination Dr. Ignelzi testified that he had performed hundreds of back surgeries, including PLIFs, in order to establish his competency.[19]

The juxtaposition of Dr. Ignelzi's testimony on direct examination and his conclusion that plaintiff's condition could only result from some negligence during surgery rendered Dr. Ignelzi's ability to perform such surgeries relevant. "Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility."[20] Because expert testimony is admitted to assist the trier of fact, it was imperative that opposing counsel be afforded the opportunity to cross-examine Dr. Ignelzi to expose the weaknesses in his knowledge, skill, experience, training, or education.[21]

We find further that the defendant's line of questioning was not more prejudicial than probative. MRE 403 states in pertinent part, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." There is no question that the line of questioning was potentially damaging

---

[19] Plaintiff acknowledges that prior PLIF surgeries performed by Dr. Ignelzi are relevant.

[20] *People v Gambrell*, 429 Mich 401, 408; 415 NW2d 202 (1987).

[21] MRE 702 states:

If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

to Dr. Ignelzi and therefore to plaintiff's case.[22] We continue to believe that "[w]itnesses should not be subjected to personal attacks and unsubstantiated insinuations."[23] Nor will we tolerate studied attempts to "prejudice the jury and divert the jurors' attention from the merits of the case."[24] However, evidence does not present a danger of unfair prejudice unless it threatens the fundamental goals of MRE 401 and MRE 403: accuracy and fairness. Gold, *Federal Rule of Evidence 403: Observations on the nature of unfairly prejudicial evidence,* 58 Wash L R 497 (1983). Our review of the record persuades us that there was no danger of unfair prejudice resulting from this line of questioning.

### B

#### PRIOR MEDICAL MALPRACTICE CLAIMS

On cross-examination, the following exchange between defense counsel and Dr. Ignelzi occurred:

*Q.* Have you ever been a defendant in a malpractice suit, Doctor?
*A.* No.
*Q.* You haven't?
*A.* No.

---

[22] The substance of the cross-examination in this case regarding prior poor surgical results is distinguishable from *People v Chaplin,* 412 Mich 219; 313 NW2d 899 (1981), cited by plaintiff. In *People v Chaplin,* this Court ruled that it was improper to impeach a witness on cross-examination by showing that she was a prostitute, because her moral character was not probative of her propensity for truthfulness. Insofar as the evidence of the witness' prostitution was relevant to show bias, this Court held further that it should be excluded because the danger of unfair prejudice substantially outweighed its probative value.

[23] *Wayne Co Bd of Rd Comm'rs v GLS LeasCo,* 394 Mich 126, 134; 229 NW2d 797 (1975) (an expert witness was repeatedly accused of lying and feigning ignorance of relevant information).

[24] *Kern v St Luke's Hosp,* 404 Mich 339, 354; 273 NW2d 75 (1978) (defense counsel repeatedly characterized the plaintiff's expert testimony as "bought" and "collusive").

*Q.* I know I've got it here somewhere, Doctor. I've just got to take a moment to find it, if I may. The case of Kristeen [sic] . . .

\* \* \*

*Q.* The Superior Court of the State of California for the County of San Diego in the case of Kristine Loreago and Doris Loreago plaintiffs, versus Ronald J. Ignelzi, do you recall that?

*A.* I really don't remember any suit. I never testified in any depositions in this that I'm aware of.

*Q.* Breach of medical professional obligation?

*A.* I never saw that document. I don't recall it.

While prior failed back surgeries are relevant to the competency of an expert witness whose expert opinion regarding defendant's failure to perform the appropriate type of surgery at the correct level is premised on the number and variety of back surgeries the expert has performed, the mere fact that an expert may have been named in an unrelated medical malpractice action is not probative of his truthfulness under MRE 608 or relevant to his competency or knowledge.[25]

Thus, we find that it was improper for defendant to inquire into this medical malpractice action against Dr. Ignelzi. However, we find that the error was harmless. By the time that this question was raised, Dr. Ignelzi had been thoroughly discredited. He testified that plaintiff's bad result from the PLIF procedure should not have occurred absent some negligence in the operating room. Then on cross-examination, he admitted that every time he had performed this surgery it resulted in failure. Consequently, his entire testimony was

[25] See, e.g., *Heshelman v Lombardi, supra; ECCO, Ltd v Balimoy Mfg Co, Inc,* 179 Mich App 748; 446 NW2d 546 (1989). We need not decide whether evidence of prior medical malpractice would never be relevant.

placed in jeopardy and any error in allowing this question about prior medical malpractice actions was harmless. Plaintiff's counsel also rehabilitated Dr. Ignelzi on this issue on redirect examination when he elicited testimony to the effect that Dr. Ignelzi never went to trial in the malpractice case referred to by defendant.

Furthermore, because these categories of evidence are distinct, they required separate specific objections in order to preserve both for appeal. However, plaintiff did not object to this line of questioning, nor did he specifically raise the issue in his motion for mistrial. Plaintiff's attempt to consolidate his appeal of this line of questioning with his appeal of the cross-examination regarding failed non-PLIF surgeries was improper. The Court of Appeals also failed to adequately distinguish between cross-examination regarding prior poor results in back surgeries and prior medical malpractice cases.

Under MRE 103, we review unpreserved error and reverse only if the substantial rights of a party are affected.[26] Here no substantial rights of plaintiff were affected by this line of cross-examination.

### III

#### ST. MARY'S MEDICAL CENTER

Plaintiff alleged two theories of liability against St. Mary's Medical Center: first, that the hospital was negligent because it did not provide a neuro-

---

[26] MRE 103(d) states:

Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

surgeon to assist Dr. Schanz; and, second, under a res ipsa loquitur theory, that plaintiff would have suffered no injury absent negligence on the part of Mark Nichols. In a medical malpractice case, the plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury.[27] Failure to prove any one of these elements is fatal. Furthermore, evidence of a bad result alone is not sufficient to prevail under the theory of res ipsa loquitur.[28] Where a plaintiff raises res ipsa loquitur in the medical malpractice context, we require that the plaintiff prove that the event (1) is of a kind that ordinarily does not occur in the absence of someone's negligence, (2) is caused by an agency or instrumentality within the exclusive control of defendant, and (3) is not due to any voluntary action or contribution on the part of the plaintiff.[29]

Plaintiff in this case did not establish a prima facie case under either of his theories of recovery. During Dr. Ignelzi's cross-examination by St. Mary's, he specifically stated that the standard of care for PLIF surgery did not require a second doctor in assistance and that Mark Nichols had not violated any standard of care applicable to an operating room technician. In considering St. Mary's motion for a directed verdict at the close of plaintiff's case, the trial judge observed:

My recollection of the evidence is that there is no credible evidence as to the liability of the defendant hospital. However, I know that this is a drastic remedy, and I don't want to trust my own

[27] MCL 600.2912a; MSA 27A.2912(1). See also *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994).

[28] *Locke*, n 27 *supra* at 231.

[29] *Jones v Porretta*, 428 Mich 132, 150-151; 405 NW2d 863 (1987).

recollection . . . because I know it's a drastic remedy.

The Court of Appeals may overturn a jury verdict only if it is against the great weight of evidence.[30] In its summary reversal of the trial court, the Court of Appeals failed to distinguish its reasoning for reversal of the verdict of no cause of action with respect to St. Mary's Medical Center from its reversal of the verdict with respect to Dr. Schanz. The plaintiff's theories against each defendant were separate and distinct, and it is apparent from the record that plaintiff failed to carry the burden of proof against St. Mary's.

We reverse the decision of the Court of Appeals with regard to both St. Mary's and Dr. Schanz and reinstate the trial court's verdict of no cause of action.

BRICKLEY, C.J., and BOYLE and RILEY, JJ., concurred with WEAVER, J.

LEVIN, J. (*dissenting*). The majority rules that the impeachment of Dr. Ronald Ignelzi with allegations of prior bad surgical results was permissible. The majority further rules that it was error to impeach him with questions concerning medical malpractice claims against him, but that the error was harmless. The majority reinstates the verdict of no cause of action for defendant Dr. George P. Schanz and codefendant St. Mary's Medical Center.

In concluding that the trial judge did not abuse her discretion in allowing impeachment by allegations of bad surgical results, the majority ignores

[30] *Granstrom v Gray,* 365 Mich 349; 112 NW2d 560 (1961); *Newton v Huddle,* 22 Mich App 314; 177 NW2d 222 (1970); *Lake Oakland Heights Park Ass'n v Waterford Twp,* 6 Mich App 29; 148 NW2d 248 (1967).

facts that made this line of questioning especially misleading and unfair to plaintiff. But even without these omissions, the questioning was violative of MRE 608(b).

We agree with the majority that the questioning about prior medical malpractice litigation was improper. There is no reason, however, to distinguish such questions from those about bad surgical results.

The majority's conclusion that the medical malpractice impeachment was harmless error is not persuasive.

We also disagree with the majority's reinstatement of the jury verdict for codefendant St. Mary's Medical Center.

I

The majority acknowledges that Ignelzi "was under a gag order" not to discuss his involvement in "certain federal court cases."[1] The majority omits that the gag order was issued in two cases arising out of the very facts about which Ignelzi was cross-examined.

The cross-examination concerning alleged surgical mishaps related to a lawsuit filed by Ignelzi. California hospitals at which Ignelzi practiced had revoked his surgical privileges for a period of time in the early 1980s. The revocation appears to have resulted from the surgical results mentioned on cross-examination. Ignelzi sued to have his privileges reinstated, with apparent success.

The court handling that litigation sealed the record and apparently ordered the parties not to discuss the matter. The defense in this case obtained the information and sought to cross-examine Ignelzi about it.

---

[1] *Ante,* p 478, n 14.

Plaintiff informed the judge of the gag order and objected repeatedly to this line of questioning. The judge permitted the defense to ask Ignelzi whether his privileges had ever been terminated, and about the surgical results.[2]

To obey the gag order, Ignelzi was left with an unenviable choice. He could refuse to comment on these matters, which a jury would likely interpret as virtually an admission of misfeasance. Or, in the face of the defense attorney's detailed questions, Ignelzi could fail to acknowledge that these incidents occurred, and appear untruthful. He chose the latter course, but forcing this choice was unfair to the plaintiff and·misleading to the jury.

II

Apart from these unusual facts, the cross-examination concerning alleged prior surgical mishaps and past medical malpractice litigation was improper. Michigan Rule of Evidence 608(b) provides:

> Specific instances of the conduct of a witness, for ·the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, *if probative of truthfulness or untruthfulness,* be inquired into on cross-examination of the witness (1) *concerning the witness' character for truthfulness or untruthfulness* . . . . [Emphasis added.][3]

Under Rule 608(b), a witness may not be impeached by an inquiry into specific past acts unless the court finds that those acts reflect on the wit-

---

[2] The judge did forbid the defense from proving these incidents through extrinsic evidence.

[3] Rule 608(b) is identical to the federal rule and similar to its counterparts in many other states.

ness' character for truthfulness.[4] The allegations of prior surgical mishaps by Dr. Ignelzi had nothing to do with his truthfulness. Permitting such questions was improper under MRE 608(b).

A

The majority argues that this Court should ignore the plain meaning of MRE 608(b). It would allow such impeachment because "[w]here information is relevant and not unduly prejudicial, it would be unwise to apply MRE 608 so that the jury is deprived of information that would assist it in its task."[5]

Under common-law rules of evidence, the cross-examination of Ignelzi would also have been improper. Where not relevant to truthfulness, "allegations of professional wrongdoing, misconduct or negligence that is unrelated to the case on trial is not a proper subject of impeachment of an expert medical witness."[6] This rule of law seeks to avoid the substantial risk of distracting and confusing the jury with a "minitrial" on collateral matters:

> In order for the jury to assess [the past acts] in weighing [the expert's] opinion in the present case, the jury would have had to have known, at a minimum, the circumstances of the other cases, the nature of the mistakes made in those cases, how they occurred, and what, if anything, about

---

[4] *People v Bouchee,* 400 Mich 253, 268; 253 NW2d 626 (1977); 28 Graham, Federal Practice & Procedure (interim ed), § 6504, pp 21-23.

[5] *Ante,* pp 479-480.

[6] *State v Lindh,* 161 Wis 2d 324, 360; 468 NW2d 168 (1991). See also *People v Mitchell,* 131 Mich App 69, 72-73; 345 NW2d 611 (1983); *State v Paradise,* 213 Conn 388, 402-405; 567 A2d 1221 (1990) (barring inquiry into a prior investigation of a witness for official misconduct as chief medical examiner of New York City as being of "dubious relevance" and leading to a minitrial on collateral issues); *Downey v Weston,* 451 Pa 259; 301 A2d 635 (1973) (barring inquiry into an expert medical witness' breach of medical ethics).

those cases made it more likely that [the expert] was mistaken in his opinion [in the present case].[7]

Little would have been gained by a minitrial concerning Ignelzi's failed procedures. The alleged acts of negligence were unrelated to the subject of his testimony. They allegedly occurred in the performance of procedures other than the PLIF procedure at issue in this case.[8]

### B

The majority argues that the impeachment related to Ignelzi's "competency to condemn defendant . . . ."[9] Evidence that a medical expert has made mistakes in practice does little to disprove his understanding of the standard of care expected of a neurosurgeon performing back surgery. As the cliche goes, "those who can't do, teach," or coach, or become referees or judges.

In *Morrow v Stivers,* 836 SW2d 424 (Ky App, 1992), an expert witness had relinquished his medical license for five years after allegedly transmitting hepatitis to patients. The Kentucky Court of Appeals affirmed the exclusion of such evidence, stating that this alleged past misfeasance

> does not reflect on his knowledge or ability to testify on the matters at hand, i.e., the causation of [the plaintiff's] condition and any deviation by [the defendant] from the standard of care.[10]

Because Ignelzi's alleged bad surgical results were described so gruesomely, "the inflammatory effect [of the questioning], although unproven, would outweigh any probative value it might

---

[7] *Paradise,* n 6 *supra* at 404.

[8] Ignelzi was also cross-examined about his performance in past PLIFS. Plaintiff does not claim this line of questioning was improper.

[9] *Ante,* p 479.

[10] *Id.,* p 429.

have."[11] The risk of unfairly prejudicing the jurors
against Ignelzi, as well as the risk of confusion and
distraction of issues, substantially outweighed
whatever slight relevance the questioning had in
evaluating Ignelzi's testimony. MRE 403.

### III

The majority correctly recognizes that a medical
expert should not be questioned about past medi-
cal malpractice litigation arising out of allegedly
failed operations, because it is not relevant to the
expert's competency or knowledge as a witness.[12]
Yet it concludes that allegations of failed back
surgeries—in which a medical malpractice action
may or may not have been filed—should be treated
differently.

The majority states that a past action for medi-
cal malpractice "is not probative of [a witness']
truthfulness . . . or relevant to his competency or
knowledge."[13] The majority offers no reason for its
conclusion that allegations of poor medical results
should be viewed differently when they have not
led to an action for professional negligence. If
anything, such claims would seem even less proba-
tive than evidence of medical malpractice litiga-
tion. The risks of confusion and distraction of a
"minitrial" that justify excluding allegations of

[11] *Id.*

[12] *Ante,* p 482. See also *Moses v Haney,* 725 P2d 866, 868 (Okla,
1986); *Heshelman v Lombardi,* 183 Mich App 72, 85; 454 NW2d 603
(1990); *Mazzone v Holmes,* 197 Ill App 3d 886; 557 NE2d 186 (1990).

The few opinions permitting such impeachment generally treat past
malpractice lawsuits as probative of possible bias or interest, and thus
truthfulness, of the expert. *Underhill v Stephenson,* 756 SW2d 459
(Ky, 1988); *Willoughby v Wilkins,* 65 NC App 626; 310 SE2d 90 (1983).
But see *Navarro de Cosme v Hospital Pavia,* 922 F2d 926 (CA 1,
1991). The majority does not suggest that any of the questions about
past lawsuits or alleged surgical mishaps relate to Ignelzi's character
for truthfulness.

[13] *Ante,* p 482.

surgical mishaps loom as large as when evidence of medical malpractice litigation is offered.

IV

The majority also rules that the error in permitting cross-examination concerning past medical malpractice litigation was harmless, stating:

> By the time that this question was raised, Dr. Ignelzi had been thoroughly discredited. He testified that plaintiff's bad result from the PLIF procedure should not have occurred absent some negligence in the operating room. Then on cross-examination, he admitted that every time he had performed this surgery it resulted in failure. Consequently, his entire testimony was placed in jeopardy and any error in allowing this question about prior medical malpractice actions was harmless.[14]

This argument is based on an incomplete, and thus inaccurate, characterization of the trial testimony. On direct examination, Ignelzi testified that plaintiff's symptoms—increased back pain and numbness in his legs—would not have occurred but for negligent performance of the PLIF procedure. On cross-examination, defendant's attorney asked:

> Q. And the six PLIF procedures that you performed were failures, am I correct?
> A. They didn't relieve the pain.
> Q. Yes. And you've testified in your deposition that you would consider them failures?
> A. In the sense that they did not relieve the pain.

Failing to improve a patient's condition cannot

14 *Ante,* pp 482-483.

properly be equated with worsening it through negligence. Ignelzi's inability to improve his patient's conditions through the PLIF procedure does not call into question his knowledge of the standard of care for performing PLIFs, and his testimony that, absent negligence, even an unsuccessful PLIF should not have worsened Wischmeyer's problem. Evidence of failure to·have improved patients' conditions does not mean that Ignelzi's "entire testimony was placed in jeopardy."[15]

The judge exacerbated the error in permitting the cross-examination by her disparate treatment of the parties on this issue. Although the judge allowed impeachment of Ignelzi with these questions, she ruled that the same inquiry could not be conducted of defendant Schanz, who testified on his own behalf during the trial.[16]

Before the trial, the judge granted Dr. Schanz' motion to preclude plaintiff from inquiring about prior medical malpractice actions filed against Schanz. Then, the judge and plaintiff's attorney agreed that questions about factually dissimilar surgical malpractice actions should be excluded. Defendant's attorney had argued that such inquiries have "absolutely no relevance" and tend to confuse the issues, as well as having "far more prejudicial [effect] than it would have probative value."

Yet later, at the trial, the judge permitted plaintiff's expert witness to be impeached with the same inquiry. This disparate treatment only adds to the error of allowing cross-examination of Ignelzi concerning prior litigation.[17]

---

[15] *Ante,* pp 482-483.

[16] When a defendant physician takes the stand in his own behalf, he may be questioned as an expert witness. See, e.g., anno: 11 ALR5th 1, 16.

[17] Cf. *Webb v Angell,* 155 Ill App 3d 848, 860-861; 508 NE2d 508

The majority errs in asserting that plaintiff failed to object to the cross-examination about prior litigation. As discussed above, there is no reason to distinguish between evidence of past alleged surgical mishaps and evidence of medical malpractice litigation. Defendants have not argued that plaintiff failed to object to the inquiry concerning medical malpractice litigation. Schanz' brief treats plaintiff's objections as covering both the malpractice litigation and the general allegations of surgical mishaps.[18]

V

The errors in impeaching Dr. Ignelzi benefited St. Mary's Medical Center as well as Dr. Schanz, because Ignelzi had also testified that the hospital may have breached the standard of care.

The majority rules that plaintiff "did not establish a prima facie case . . . ."[19] In effect, it would grant a directed verdict to St. Mary's Medical Center. This issue was not addressed by the Court of Appeals.[20]

CAVANAGH and MALLETT, JJ., concurred with LEVIN, J.

---

(1987) (finding no abuse of discretion where the trial judge barred questioning of both parties' experts about prior lawsuits).

[18] Now, certainly, later in the cross-examination of Dr. Ignelzi with respect to inquiries regarding numerous failed operations, lost staff privileges and malpractice suits, some objections were raised by Plaintiffs' trial counsel but . . . no such objections were ever stated as to the cross-examination to the unsuccessful six PLIF operations.

That argument ignores that plaintiffs do not contend that the cross-examination about the PLIFs was erroneous. See n 8.

[19] Ante, p 484.

[20] At the most, this Court should remand this issue to the Court of Appeals for consideration.