McCARTY v SISTERS OF MERCY HEALTH CORPORATION

Docket No. 105691. Submitted February 15, 1989, at Grand Rapids. Decided April 18, 1989. Leave to appeal applied for.

Debra and Michael McCarty, as copersonal representatives of the estate of their deceased child, Matthew Ryan McCarty, brought an action in Kent Circuit Court alleging negligence by Sisters of Mercy Health Corporation, Butterworth Hospital, Grand River Ob-Gyn, P.C., James R. Irwin, M.D., and Earl R. Williams, M.D., relating to medical treatment received by Debra McCarty during her pregnancy with, and delivery of, Matthew Ryan McCarty. Defendants Sisters of Mercy and Butterworth Hospital were dismissed from the action by stipulation prior to trial. A jury returned a verdict in favor of the remaining defendants and the trial court, Roman J. Snow, J., entered a judgment consistent with the verdict. Plaintiffs appealed, claiming error occurred when, in the cross-examination of a physician who testified as an expert for the defense, the trial court prevented plaintiffs' counsel from impeaching the physician through the use of a medical journal article which contradicted the physician's testimony as to the appropriate standard of care.

The Court of Appeals *held:*

Under MRE 707, medical textbooks or other publications may be used to cross-examine an expert witness if the expert recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative. In this case, although the physician in question refused to refer to the medical journal as authoritative, he nonetheless acknowledged the journal to be "an excellent review journal," "as close to a bible as obstetricians have today," and "as reliable as anything we have in our literature." The trial court therefore erred in preventing plaintiffs' counsel from introducing the article at trial.

Reversed and remanded for a new trial.

1. EVIDENCE — WITNESSES — EXPERT WITNESSES — CROSS-EXAMINA-TION — MEDICAL PUBLICATIONS — JUDICIAL NOTICE.
Medical textbooks or other publications may be used to cross-

REFERENCES
Am Jur 2d, Expert and Opinion Evidence §§ 66-68.

examine a physician testifying as an expert if the physician recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative (MRE 707).

2. EVIDENCE — WITNESSES — EXPERT WITNESSES — CROSS-EXAMINA-
   TION — MEDICAL PUBLICATIONS.

   A trial court abused its discretion in preventing a party from impeaching a physician who testified as a hostile expert witness through the use of a medical journal article which contradicted the physician's testimony where the physician refused to refer to the journal as authoritative, but acknowledged the journal to be "an excellent review journal," "as close to a bible as we have today," and "as reliable as anything we have in our literature."

*Tolley, Fisher & Verwys, P.C.* (by *Mark H. Verwys* and *Todd R. Dickinson*), for plaintiffs.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather*), for James R. Irwin, M.D., Earl R. Williams, M.D., and Grand River Ob-Gyn, P.C.

Before: HOOD, P.J., and WAHLS and NEFF, JJ.

PER CURIAM. In this medical malpractice case, Debra McCarty and Michael McCarty, as copersonal representatives of the estate of their deceased infant son, Matthew Ryan McCarty, appeal as of right from a December 11, 1987, order of the Kent Circuit Court dismissing their lawsuit against defendants James R. Irwin, M.D., Earl R. Williams, M.D., and Grand River Ob-Gyn, P.C.,[1] pursuant to a jury verdict in favor of defendants. We find that the trial court committed error warranting reversal in precluding plaintiffs' counsel from impeaching the credibility of the testimony of Carl Brandt, M.D., an expert witness for defendants, with an article published in a scholarly

---

[1] In accordance with pretrial stipulations, orders were issued by the trial court dismissing with prejudice plaintiffs' claims against defendants Sisters of Mercy Health Corporation and Butterworth Hospital.

medical journal. Accordingly, we reverse the trial court's order of dismissal and remand this case for a new trial.

The record reveals that Debra realized she was pregnant in November, 1984, and that during her pregnancy she was seen approximately once per month by Dr. Williams and once by Dr. Irwin. Her expected date of delivery was July 7, 1985. On July 21, 1985, her pregnancy was considered post-term. On July 25, 1985, Debra experienced some vaginal bleeding. Dr. Irwin instructed her by tele-phone to undergo the nonstress test that she was scheduled for at 8:00 A.M. that day. According to Debra, the nonstress test did not disclose much movement by the baby, but did reveal that the baby's heartbeat "sounded fine." After the stress test, Debra continued to bleed and was experienc-ing minor contractions, and therefore was exam-ined by Dr. Irwin at 3:00 P.M. that day. She was told that her cervix had dilated only three centi-meters and that she should go home and wait for labor to begin. That afternoon, while at home, Debra began bleeding as if she were menstruating and, upon calling her doctor's office, was told by a receptionist or nurse, who had consulted Dr. Irwin, that the bleeding was due to her earlier examina-tion and that she should wait to call back until contractions were coming five to seven minutes apart for an hour.

The bleeding continued, and on the next after-noon, Friday, July 26, 1986, after talking to her mother, Debra again called her doctor's office. A nurse told her that Dr. Irwin was getting ready to leave, but relayed Dr. Irwin's instruction that she should wait to call back until her contractions were coming five to seven minutes apart for an hour. The bleeding and minor contractions contin-ued throughout Saturday, July 27, 1985. On Sun-

day, July 28, 1985, Debra was awakened at 3:30 A.M. by severe pains. She awakened her husband at 4:30 A.M. after having timed her contractions as coming five to seven minutes apart for an hour. Michael called the doctor's office at 4:45 A.M. and his call was returned at 5:00 A.M. He was told not to rush, to permit Debra to take a shower, and then to go to the hospital. After showering, packing and making arrangements for a friend to care for their daughter, Debra and Michael arrived at the hospital at 6:30 A.M. When Matthew Ryan McCarty was delivered by Caesarean section he showed no signs of life. Eventually, he was resuscitated, but he suffered from severe central nervous system damage, cerebral palsy, seizure disorder, deafness, blindness, and severe mental retardation. He died on December 26, 1986.

Plaintiffs argue that the trial court erred in precluding their counsel at trial from impeaching the testimony of Carl Brandt, M.D., an expert witness for defendants, with an article published in a scholarly medical journal. We agree with plaintiffs.

In *Jones v Bloom,* 388 Mich 98, 118; 200 NW2d 196 (1972), the Supreme Court held that "medical textbooks or other publications may be used to cross-examine expert witnesses if the expert recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative." See also *Dziurlikowski v Morley,* 143 Mich App 729, 732-733; 372 NW2d 648 (1985), aff'd 428 Mich 132; 405 NW2d 863 (1987). In addition, MRE 707 provides:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals or

pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only.

In the present case, plaintiffs' counsel, during the cross-examination of Carl Brandt, M.D., an expert witness for defendants who had stated on direct examination that Drs. Irwin and Williams did not breach any standard of care, attempted to impeach the credibility of Dr. Brandt's testimony with an article entitled "Prolonged Pregnancy: The Management Debate," published in the June, 1987, edition of the *Obstetrical and Gynecological Survey,* for the purpose of establishing that the applicable standard of care required Debra, during her postterm pregnancy, to have been given an ultrasound test in order to determine the volume of amniotic fluid present and, as a result, the well-being of the baby. Regarding this issue, the following testimony, objection, and ruling were recorded:

*Q.* Now, was ultrasound testing used in 1985 to evaluate the condition of babies in the mother's womb prior to birth?
*A.* Yes.
*Q.* Should that have been done in this case?
*A.* I saw nothing on Mrs. McCarty's prenatal record that put her in any sense of a high-risk situation, that would have required ultrasound during her pregnancy. Her dates were good, her growth was appropriate, they felt the fetal heart tones at 13 or 14 weeks with a Doptone, which was compatible with her due date. We usually use ultrasound to confirm our dates, is what we use it mostly for. Secondly, would be if there was a discrepancy in growth later in her pregnancy, to try to get a baseline on size, and to confirm that our dates were correct initially.

*Q.* Putting all that aside, doesn't it also enable you to assess the volume of amniotic fluid in the best way possible.

*A.* Yes, but we order it for that—we rarely order ultrasound just for that reason.

*Q.* Are you familiar with Dr. Stuart Taylor?

*A.* Stuart Taylor, I have heard of Dr. Stuart Taylor, yes.

*Q.* What do you know of Dr. Stuart Taylor?

*A.* I have never met the man. I believe he is the head of the department at Denver, Colorado.

*Q.* It's true, is it not, that he is the Professor Emeritus of Obstetrics and Gynecology at the University of Colorado, who is the obstetrical editor-in-chief of the *Obstetric[al] and Gynecological Survey*?

*A.* I believe that's true.

*Q.* Is the *Obstetrical and Gynecological Survey* an authoritative publication, in your view?

*A.* It's an excellent review journal. They take a cross-section of articles in all of our different journals, and there is an editorial board that editorializes on that particular subject. I would never admit to any journal being authoritative.

*Q.* And what does "authoritative" mean to you, Doctor?

*A.* Well, in this case it means that everything within that journal would be considered absolute truth, and that's not always the case.

*Q.* Okay. Would you agree that the *Obstetrical and Gynecological Survey* is probably as close to a bible as obstetricians have today?

*A.* That I would agree to.

*Q.* But it's not authoritative?

*A.* No, not in every single issue.

*Q.* Now, are you familiar with a review that Dr. Stuart Taylor did in the *Obstetrical and Gynecological Survey* in, I believe it was June of 1987?

*A.* Yes.

*Q.* Entitled "Prolonged Pregnancy, The Management Debate"?

*A.* Yes.

*Q.* It states in there that when the patient . . .

*Mr. Grostic* [attorney for defendants Irwin, Williams and Grand River Ob-Gyn, P.C.]: Your Honor, that's an inappropriate use of that journal. He can't read from the journal, it hasn't been admitted to be authoritative, and he has just testified it was June of '87.

*Mr. Dickinson* [attorney for plaintiffs]: Your Honor, the witness has stated that it is as close to a bible as obstetricians have today.

*The Court*: But he does not recognize it as a reliable authority.

*Mr. Dickinson*: I beg your pardon?

*The Court*: He does not recognize it as authoritative.

*By Mr. Dickinson*:

*Q.* Do you recognize any treatises in this field as authoritative?

*A.* No, I do not.

*Q.* And the *Obstetrical and Gynecological Survey* is, as you have stated, as close to a bible as obstetricians have today, correct?

*A.* I believe I stated that in my deposition, and it was my way of saying that of the 15 or 20 periodicals that we review for Journal Club, this is one that we often will go back and consider as reliable as anything we have in our literature, but that does not make it authoritative. They review 30 to 40 articles every single month; some we would agree with, some they criticize, some they are presenting just for information sake. It does not make it authoritative.

*Mr. Dickonson*: Your Honor, based upon what the witness has stated about this publication, and given the fact that the only thing that he would consider to be authoritative would be something that was infallible, I think we have set the standard for using this article for impeachment purposes.

*Mr. Grostic*: Well, I renew my objection, and also again point out it's June of '87.

*The Court*: I will sustain the objection.

*Mr. Grostic*: Thank you, your Honor.

A decision whether to admit evidence rests within the discretion of the trial court and that decision will not be set aside on appeal absent an abuse of discretion. *Hadley v Trio Tool Co,* 143 Mich App 319, 328; 372 NW2d 537 (1985). In the present case we find that the trial court abused its discretion in precluding plaintiffs' counsel from impeaching the credibility of Dr. Brandt with the article from the *Obstetrical and Gynecological Survey.*

Under MRE 707, information published in a medical periodical which is established as being reliable authority by the testimony or admission of an expert witness may be used for impeachment purposes during the cross-examination of that expert witness. Dr. Brandt himself admitted that the *Obstetrical and Gynecological Survey* is "an excellent review journal," "as close to a bible as obstetricians have today," and "as reliable as anything we have in our literature." Nevertheless, he opined that the journal was not "authoritative" because everything in it could not always be considered "absolute truth." Medical or any other authority, however, need not, and, indeed, cannot, always provide the absolute truth. Rather, as included in the definition of the word "authority" in *The American Heritage Dictionary of the English Language* (1973), an authority is "[a]n accepted source of expert information or advice, as a book or person," or as in *Webster's Third New International Dictionary* (1961), "one who is cited or appealed to as an expert whose opinion deserves acceptance." History, including the history of legal precedents, is replete with examples of the observation that, while truth is always authoritative, authority is not always true. Although authority,

as the most reasoned and considered attempt at formulating and enunciating truth, may at times overshadow its object, it is nevertheless acknowledged to be a valuable source of reliable information.[2] Dr. Brandt's praise for the *Obstetrical and Gynecological Survey* and his assessment that that periodical is "as reliable as anything we have in our literature" undermine his assertion that that periodical is not authoritative. Thus, the trial court abused its discretion in precluding plaintiff's counsel from using it for impeachment purposes under MRE 707 on the ground that its authoritative status was not admitted by the expert witness.

In their appellate brief, defendants contend that the trial court acted correctly in sustaining the objection to the use of the journal article because the article was published after the date of the birth of plaintiff's son. While this argument may have some merit, it was not addressed and decided by the trial court. Generally, this Court will not review an issue which was not addressed and decided by the trial court. *Providence Hospital v Nat'l Labor Union Health & Welfare Fund,* 162 Mich App 191, 194; 412 NW2d 681 (1987).

In light of our finding that plaintiffs are entitled to a new trial due to the trial court's abuse of discretion in precluding plaintiffs' counsel from impeaching the credibility of an expert witness of defendants with an article published in a scholarly medical journal, we need not address the remaining issues raised on appeal by the parties.

Reversed and remanded for a new trial.

[2] Alberti, in *Del Principe III,* wrote that "[n]othing overshadows truth so completely as authority," and Pascal, in *Pensees,* noted that "[w]hen we do not know the truth of a thing, it is good that there should exist a common error which determines the mind of man." These observations, while perhaps neither truthful nor authoritative, at least demonstrate that influential thinkers have not equated, as did Dr. Brandt in the present case, authority and truth.