# STATE OF MICHIGAN

# COURT OF APPEALS

BECKI WASSMANN,

        Plaintiff-Appellant,

v

RICHARD D. BATES, M.D,

        Defendant-Appellee.

UNPUBLISHED
February 18, 2016

No. 322493
Alpena Circuit Court
LC No. 12-004729-NH

Before: METER, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, Becki Wassmann, appeals as of right from a judgment of no cause of action following a jury trial. Of the three issues plaintiff raises on appeal, we find one to be both meritorious and affecting plaintiff's substantial right to a fair trial for which a failure to reverse would be inconsistent with substantial justice. Due to defense counsel's improper impeachment of plaintiff's expert witness with an irrelevant and prejudicial administrative complaint and consent judgment, the trial court's improper admission of the complaint and consent judgment into evidence in violation of MRE 608(b), and defense counsel's repeated references to these irrelevant and prejudicial documents for purposes of character assassination during opening statement and closing argument, we reverse and remand.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff went to see defendant, Richard D. Bates, M.D., for treatment in November 2010 because she had been experiencing abdominal pain and severe menstrual bleeding for two months. An ultrasound showed no polyps inside plaintiff's uterus, but the endometrial lining of the uterus was thickened. Defendant performed a pap smear and removed a polyp on plaintiff's cervix. Defendant also performed an endometrial biopsy[1], which tested negative for disease.

---

[1] An endometrial biopsy entails taking a tissue sample from the lining of the uterus.

-1-

Plaintiff's pain and bleeding continued, and she followed up with defendant. Defendant diagnosed her with adenomyosis.[2] Plaintiff expressed a desire for treatment with the shortest possible recovery time. Defendant believed that a supracervical hysterectomy[3] would be plaintiff's best option.

On December 28, 2010, defendant conducted a supracervical hysterectomy by way of laparoscopic surgery, wherein instruments, including a camera, were inserted into plaintiff's abdomen through a small incision. During surgery, defendant and Dr. Brendan Conboy, who assisted defendant, used a television screen to visualize plaintiff's abdominal cavity. One of the tools used to remove plaintiff's uterus was a GYRUS, which clamps, burns, and then cuts tissue. It is undisputed that plaintiff suffered an injury to the distal end of her right ureter[4] at some point during the surgery. Following surgery and until approximately August 2012, plaintiff experienced a number of complications involving voiding urine and incontinence, requiring several procedures to correct the problem.

Plaintiff sued defendant for medical malpractice, alleging that he breached the standard of care in two respects. First, he should have attempted a less invasive procedure called an endometrial ablation[5] instead of a supracervical hysterectomy surgery; a supracervical hysterectomy is more invasive and carries a greater risk of complications. According to plaintiff, an endometrial ablation has a very high success rate, and in this instance, it more than likely than not would have made the riskier surgery unnecessary, thus averting the complication that ensued. Second, during the supracervical hysterectomy, defendant breached the applicable standard of care because he cut or burned the ureter, which he admitted he never visualized. In other words, he necessarily moved the cautery tip outside his field of view. Defendant claimed that he did not commit malpractice because plaintiff was not a good candidate for an endometrial ablation and the damage to plaintiff's ureter during the supracervical hysterectomy surgery was due to inadvertent thermal spread, an indirect injury caused by the cautery device that was not his fault.

---

[2] Adenomyosis "occurs when endometrial tissue, which normally lines the uterus, exists within and grows into the muscular wall of the uterus. The displaced endometrial tissue continues to act as it normally would—thickening, breaking down and bleeding—during each menstrual cycle. An enlarged uterus and painful, heavy periods can result." Mayo Clinic, *Diseases and Conditions*, <http://www.mayoclinic.org/diseases-conditions/adenomyosis/basics/definition/con-20024740> (accessed February 11, 2016).

[3] In a supracervical hysterectomy, the body of the uterus is removed but the cervix is left intact.

[4] The ureter is the duct by which urine passes from the kidney to the bladder.

[5] "Endometrial ablation is a procedure that destroys (ablates) the uterine lining, or endometrium. This procedure is used to treat abnormal uterine bleeding . . . . The endometrium heals by scaring, which usually reduces or prevents uterine bleeding. Endometrial ablation may be done in an outpatient facility or in [a] doctor's office." WebMD, *Women's Health*, <http://www.webmd.com/women/endometrial-ablation-16200> (accessed February 11, 2016).

## A. PLAINTIFF'S CASE-IN-CHIEF

At trial, plaintiff admitted into evidence portions of defendant's deposition testimony wherein he agreed to various aspects of the standard of care, including the need to identify and avoid injury to the patient's ureters. Plaintiff also admitted portions of defendant's expert witness Dr. Dov Schuchman's deposition testimony addressing the topic of visualization when utilizing a thermal device.

In her testimony, plaintiff described her two-month history of pain with menstruation and an extended menstrual cycle, as well as her treatment with defendant. She recalled defendant considering endometriosis as a possible diagnosis, a condition that her sister had experienced. She recalled defendant removing a polyp, and laboratory testing revealed that it was normal. Plaintiff did not recall defendant discussing the possibility of adenomyosis as the cause of her problems or treatment by way of an endometrial ablation. She testified regarding the significant medical complications that ensued after surgery and how it affected her life. James Leeseberg, who was living with plaintiff at the time of the surgery, testified regarding his observations of plaintiff at the time of and following surgery, as did plaintiff's mother. The *de bene esse* deposition of Dr. Aditya Bulusu was read into evidence.[6]

Plaintiff called as an expert witness Dr. Ronald Zack, whose testimony was procured and read into evidence by way of a *de bene esse* deposition. Dr. Zack testified that plaintiff's ureters should have been visible during the surgery, and that, to meet the applicable standard of care, "[y]ou have to know where the ureters are" during a supracervical hysterectomy. He testified that the standard of care prohibited cutting, burning, or clamping any area that was not visible on the television screen. Dr. Zack noted that defendant's operative report did not indicate that he ever visualized plaintiff's ureters. Given defendant's statement in his deposition that he was not able to visualize the ureter that was injured during surgery, Dr. Zack opined that defendant "negligently burned a ureter in an area that he could not visualize . . . ."[7] Dr. Zack rejected defendant's thermal spread theory. According to Dr. Zack, just as a match touched to skin may burn slightly beyond the contact point, thermal spread can occur beyond the tip of the cautery tool used during surgery, but the doctor should know how far the heat is going to be transmitted from the instrument, control the wattage of heat used to burn tissue, and make sure to stay away from nearby structures. Dr. Zack did not believe that thermal spread was the cause of plaintiff's injured ureter.

Dr. Zack also testified that a supracervical hysterectomy surgery was not necessary in the first place. He explained that upon verifying there is no cancer, malignancy, or similar condition, a physician treating a patient's symptoms like plaintiff's must pursue treatment

---

[6] Dr. Bulusu's *de bene esse* deposition, which was read to the jury at trial but not transcribed, is not part of the trial court record and neither party produced it on appeal.

[7] Dr. Zack clarified that damage can occur to ureters during the normal course of safely operating on a patient, but if the doctor cuts or clamps an area he or she cannot visualize, he or she is violating "one of the hallmarks of surgery," and committing a breach of the standard of care.

options "going from the safest, least invasive to the most invasive. . . . If you go too far and cause problems, you can't take that back." Given plaintiff's medical history, he believed that the proper course of treatment was an endometrial ablation, which is less invasive, and thus, less risky than a supracervical hysterectomy. He described an endometrial ablation as a "ten-minute outpatient procedure" that involves burning the lining of the uterus. Unlike a laparoscopic supracervical hysterectomy, it entails "absolutely no cuts or incisions" in the abdomen, and when done correctly, it does not cause ureteral injury. According to Dr. Zack, in "greater than 90 percent" of patients who undergo an endometrial ablation, it will "stop their bleeding and help their pain either to disappear or significantly improve it." With regard to plaintiff, Dr. Zack testified that an endometrial ablation would "more likely than not" have corrected the problem. The failure to select this procedure for plaintiff was, in Dr. Zack's opinion, a breach of the acceptable standard of care, especially given the fact that plaintiff's symptoms had only existed for a few months.

On cross-examination, defendant presented Dr. Zack with evidence that subsequent testing of plaintiff's uterus, which was removed during the surgery, showed adenomyosis in the myometrial[8] layer of the uterus. Dr. Zack testified that in the presence of adenomyosis, an endometrial ablation burns the endometrium and superficial myometrium, and thus, it may remove superficial adenomyosis, and while it may not completely remove the adenomyosis in the myometrium, "the symptoms of adenomyosis, being the bleeding, the bleeding can't occur now because there's no [uterus] lining, so it corrects that –even if there's adenomyosis." Although he admitted there was a chance the endometrial ablation would not completely resolve plaintiff's pain issues, he felt the procedure more likely than not have would have been successful.

Defense counsel then turned his focus to money. He asked Dr. Zack what he charged for endometrial ablations. When Dr. Zack indicated that he did not know, and that it would be a question for his office manager, defense counsel asked if Dr. Zack was once charging $2,000 for the procedure. Dr. Zack indicated that it was possible, but he was doing a different form of the procedure at that time. Defense counsel then inquired whether Dr. Zack had ever gotten "into difficulty with regard to the number of ablations" he was doing, and whether he was ever "criticized for unnecessarily performing ablation procedures?" Plaintiff's counsel objected to the question as being irrelevant. Because it was a *de bene esse* deposition, determination of the admissibility of the response was left to a subsequent court ruling, wherein the trial court admitted the response as well as the entire line of questioning thereafter. Dr. Zack testified that he had never been criticized for unnecessarily performing an endometrial ablation. Defense counsel then presented a piece of extrinsic evidence in an ostensible effort to impeach Dr. Zack, and read it into the record as follows:

> Q: Never. I want to show you the consent judgment which was entered by the Department of Consumer Affairs – actually the Department of Consumer and Industry

---

[8] The myometrium is the middle layer of the uterine wall.

Services, Office of Healthcare Services, the Board of Medicine Disciplinary Subcommittee consent order entered in the matter of Ronald G. Zack.

A: What year was that [defense counsel]?

Q: This is –

A: I believe 1997, 17 years ago.

Q: 1997

A: That's correct, yes.

Q: Okay.

Plaintiff's counsel again objected to relevance, but defense counsel continued:

Q: Do you still maintain that you were never reprimanded for needlessly performing ablations?

A: I was never reprimanded for endometrial ablation.

Although the consent judgment contains no discussion of endometrial ablations, defense counsel began to question Dr. Zack regarding other unrelated medical procedures that were addressed in the consent judgment:

Q: What about laser ablation?

A: That's not endometrial, that's cervix. That had nothing to do with endometrial ablation.

Q: Were you reprimanded for doing laser ablation?

A: That's a whole diff –that's for abnormal cells and tissues. As a matter of fact, it had no effect on my license and I was not reprimanded. I was assessed $2,000. I was not reprimanded.

Q: Did you also at that time –were you also fined for unnecessarily performing hysteroscopy[9] procedures?

---

[9] Hysteroscopy is a way for a doctor to view the lining of the uterus. The doctor uses a thin viewing tool, called a hysteroscope, that contains a light and a camera, which is inserted into the vagina and gently moved through the cervix into the uterus. The images captured by the camera are then projected onto a video screen. WebMD, *Infertility & Reproduction Health Center*, <http://www.webmd.com/infertility-and-reproduction/guide/hysteroscopy-infertility> (accessed February 11, 2016).

A: Which I pled no contest to and I disagreed with the finding.

Q: So you paid the fine rather than fight the –

A: That's –

Q: --the charge?

A: That's correct.

Defense counsel continued to probe into the topic of Dr. Zack's own medical practice and the presumption that Dr. Zack, as evidenced by the administrative complaint, was a doctor who performed unnecessary medical procedures for monetary gain, thereby putting his patients at risk:

Q: The performance of an unnecessary procedure, you would agree with me, unnecessarily puts a patient at risk for complications, irrespective of whether it's hysterectomy or an ablation procedure?

A: I have never been accused by a patient of ever performing an unnecessary procedure to any board or attorney.

Q: Well then I move for the admission of this finding.

A: Those are not patients. Those are the –there was no patient complaint involved in that. That was an insurance company, [defense counsel].

Q: I have – I think –

A: There's no – there was never a patient complaint.

Q: Doctor, we're just going to – we're just going to –

A: Read it. It's from an insurance company –

Q: We're going to move to mark –

A: -- that disagreed with –

Q: We're just going to move to enter this and we'll have the jury read it.

A: Show –

[Defense counsel]: We'll move it – I move for the admission of Defendant's Exhibit Number 1.

[Plaintiff's counsel]: Number one, I will object to it as lack of any relevance to the issues in this case. You can mark it for purposes of later argument.

***

A:  As a final statement, there was never a patient complaint.  This was from an insurance company which disputed the procedures that I did, and I felt they were necessary.  There were five patients involved.  Every patient improved, not one patient ever complained to any agency or insurance company.

And secondly, endometrial ablation was never done or mentioned in any of those patients.

The trial court denied plaintiff's motion to exclude the above testimony at trial, and it was admitted.  The trial court also denied plaintiff's motion to exclude the administrative complaint and consent judgment; thus, defendant marked and admitted them into evidence during trial.

Cross examination continued, and defense counsel asked Dr. Zack if he had ever had instances where injury occurred to surrounding tissue that was not within the operative field that he was focusing on through his laparoscope.  Dr. Zack testified that he had never, in his 37 years of practice, had a bowel, bladder, or ureter injury.  Defense counsel then asked him, "Is that just as true as the testimony that you had never had a complaint brought against you by the Board of Medicine?"  Dr. Zack undertook to again defend himself regarding the administrative complaint.

As will be discussed in more detail below, in his defense of the case, defendant utilized the above testimony and disciplinary proceeding as a major theme throughout the trial.

### B.  DEFENDANT'S CASE-IN-CHIEF

Defendant presented several witnesses in support of his defense.  Dr. Bradley Boehm, plaintiff's subsequent treating urologist, testified that in his opinion, plaintiff's post-operative CT scan and the timing of her developing symptoms were more consistent with a thermal injury, rather than an inadvertent cut or burn.  Dr. Brendan Conboy, who assisted defendant with plaintiff's surgery, testified that while a doctor should know where the ureters are at all times during surgery, in his experience, they are not always visible.  He further claimed that there was never a time when the tip of the cautery device went outside the viewing screen during plaintiff's surgery.  Defendant also testified in his own defense.  He explained why he chose to perform a supracervical hysterectomy and why an endometrial ablation would not have been appropriate. He also contended that, while a surgeon should always be cognizant of where a patient's ureters are during surgery, the tip of the cautery device used in plaintiff's surgery was never outside of his field of vision, and it never came in contact with her ureter.  Like Dr. Boehm, he opined that plaintiff's uretal injury was due to thermal spread.

Dr. Dov Schuchman, another of plaintiff's subsequent care providers, also testified on defendant's behalf.  He contended that the location of plaintiff's ureteral injury was within the "penumbra" of energy that can be emitted from the cautery device used in the surgery, and that such energy can "theoretically traverse a certain amount of distance beyond our control because we—we look at the instruments, but it's known that some energy, probably the best word, can traverse beyond our intention."  Dr. Schuchman opined that it was more likely that injury would occur due to thermal spread than due to direct contact with the cautery tool.  He weighed in on standard of care, claiming that while a doctor should always know where the ureters are during

the surgery, the doctor would not be able to view the ureters at all times during the procedure. He also agreed, however, that the cautery device should not be used in an area where the operator cannot see. Dr. Schuchman disagreed with Dr. Zack's contention that the standard of care required the performance of an endometrial ablation instead of a supracervical hysterectomy surgery.

## C. OPENING STATEMENTS, CLOSING ARGUMENTS, AND VERDICT

As averred to above, defense counsel extensively utilized the administrative complaint and consent judgment against Dr. Zack, as well as all of his related testimony, in order to attack Dr. Zack's credibility and plaintiff's case as a whole. For instance, during his opening statement,[10] defense counsel impugned Dr. Zack's expected testimony in regard to whether an endometrial ablation was necessary in this case by noting that "he was fined for performing too many ablation procedures, because it's not right and it's a violation of the standard of care to perform unnecessary procedures which are not directed to the specific anatomy and per—and problem that you're treating." Counsel persisted along this line, stating that performing unnecessary procedures "runs up medical bills and [Dr. Zack] got fined for it."

Defense counsel returned to this theme during closing argument, and he suggested that Dr. Zack was responsible for "driv[ing] up" the cost of health care in America:

> [An endometrial ablation is] not going to do anything good for [plaintiff] if she has adenomyosis, but you can still bill $2,000 for it. And then later, you can do the hysterectomy too. Some doctors do that. Doctors like that drive up the cost of medicine in America today.

> One of those doctors, who was fined by the board of medicine, for doing ablation procedures unnecessarily happens to be the plaintiff's expert witness, Dr. Zack. Isn't that interesting? Dr. Zack performed unnecessary procedures to five patients and was fined for that.

After blaming plaintiff's chosen expert, Dr. Zack, for the increased cost of medical care in this country, defense counsel read to the jury the contents of the administrative complaint, which detailed the procedures—none of which are pertinent to this case—which were alleged to have been unnecessary in 1997. Finally, in discussing potential bias or interest harbored by witnesses, defense counsel returned to Dr. Zack and his assertion that Dr. Zack lied during his testimony, stating:

> A person who will deceive you on minor things—it's been my experience, that a person who will deceive a person on minor things will deceive a person on large things too. And [Dr. Zack] did. . . . . Let me see if I can find it. Okay. [By Dr.

---

[10] Because Dr. Zack's *de bene esse* deposition was taken before trial, and apparently the admissibility of his testimony was preliminarily discussed in chambers before trial, defense counsel openly discussed Dr. Zack's consent judgment during his opening statement.

Zack] "I have never been accused by a patient of ever performing an unnecessary procedure to any board or attorney." Well, yes, you have, Doctor, and you consented to the payment of a fine by five patients.

The jury returned a verdict of no cause of action against plaintiff, and this appeal followed.

## II. ANALYSIS

### A. CROSS-EXAMINATION OF DR. ZACK

Plaintiff contends on appeal that the trial court erred in admitting irrelevant and prejudicial evidence when cross-examining Dr. Zack and by improperly admitting into evidence the 1997 administrative complaint and consent judgment. We agree.

The trial court's decision regarding the scope of cross-examination is reviewed for an abuse of discretion. *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 454; 540 NW2d 696 (1995). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Moore v Secura Ins*, 482 Mich 507, 516; 759 NW2d 833 (2008). We will not reverse based on a trial court's evidentiary error " 'unless refusal to take this action appears . . . inconsistent with substantial justice,' or affects 'a substantial right of the [opposing] party.' " *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004), quoting MCR 2.613(A) and MRE 103(a).

### 1. DEFENDANT'S PURPORTED IMPEACHMENT EVIDENCE WAS IRRELEVANT AND UNDULY PREJUDICIAL

Dr. Zack testified that defendant violated the standard of care in two ways, one of which was his failure to conduct an endometrial ablation, a less invasive procedure, before resorting to a supracervical hysterectomy surgery. As noted above, defense counsel cross-examined Dr. Zack by delving into the contents of a 17-year-old administrative complaint and consent judgment. Specifically, defense counsel began by asking Dr. Zack whether he had ever gotten "into difficulty" or been criticized for unnecessarily performing ablation procedures. Plaintiff's counsel objected to the relevancy of the question. Dr. Zack focused his response on the fact that he had never been criticized for unnecessarily performing an endometrial ablation, the procedure at issue in this case. Defendant immediately produced the administrative complaint and consent judgment and proceeded to cross examine Dr. Zack regarding its contents. Despite Dr. Zack's efforts to clarify that the administrative complaint did not deal in any way with endometrial ablations, and he had never been criticized for his decision to perform that procedure, defense counsel probed further into ablations in general, prompting Dr. Zack to attempt to defend himself by stating that the administrative complaint stemmed from an insurance company that was unhappy with his billings, not from any patients taking issue with the quality of his medical care.

Our review of the administrative complaint confirms that the complaint addressed the performance of a "laser ablation of the cervix" under colposcopic guidance, which entails a different part of the female anatomy for a different medical issue. The rest of the alleged

unnecessary procedures in the administrative complaint were unrelated to the procedures at issue in this case and the majority of them did not involve ablations of any type.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Evidence which is not relevant is not admissible." MRE 402. "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." MRE 611(c). In particular, "when a case turns on the testimony of one expert compared with that of another, the credibility of each expert is relevant to the disposition of the case." *Wischmeyer v Schanz*, 449 Mich 469, 475; 536 NW2d 760 (1995). In addition, MRE 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, *may not be proved by extrinsic evidence.* They may, however, in the discretion of the court, *if probative of truthfulness or untruthfulness*, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. [Emphasis added.]

We agree with plaintiff that the administrative complaint and consent judgment were irrelevant and prejudicial and that defendant's impeachment of Dr. Zack with the documents and information contained therein was improper. The fact that Dr. Zack dealt with a 1997 administrative complaint and consent judgment regarding unrelated medical treatments had nothing to do with either his credibility regarding the issues at hand or his character for truthfulness or untruthfulness,[11] nor was the information relevant in any other way. We find our Supreme Court's decision in *Wischmeyer*, 449 Mich 469, instructive. In that case, the defense attorney attempted to cross-examine the plaintiff's medical expert about a prior, unrelated malpractice suit filed against that expert in California. *Id.* at 481-482. The Court held that "the mere fact that an expert may have been named in an unrelated medical malpractice action is not probative of his truthfulness under MRE 608 or relevant to his competency or knowledge." *Id.* at 482. This Court has reached similar conclusions. See, e.g., *Heshelman v Lombardi*, 183 Mich App 72, 85; 454 NW2d 603 (1990) ("The fact that [the expert] was named a defendant in a malpractice suit is in no way probative of his truthfulness. Nor was this fact probative of [the expert's] competency or knowledge.").

---

[11] Although defense counsel attempted to solicit a lie from Dr. Zack in order to impeach him with the documents, he was not permitted to delve into irrelevant or unduly prejudicial information in order to entice the witness to lie. Plaintiff timely objected to the line of questioning from the outset. Her objection should have been sustained. Any follow-up impeachment testimony should not have been admitted either. Moreover, review of the record reveals that Dr. Zack did not lie, so he did not subject himself to impeachment with regard to his truthfulness.

Here, the consent judgment and administrative complaint were not probative of Dr. Zack's character for truthfulness, nor were they relevant to his competency, knowledge, or credibility. As Dr. Zack noted during the deposition, he had never been cited or criticized for unnecessarily performing the procedures at issue in this case. Nor is it apparent from either the consent judgment or testimony that Dr. Zack had ever been criticized or disciplined for performing unnecessary, *less invasive procedures*, which is what defendant accused him of in this case. The complaint simply alleged that certain procedures performed by Dr. Zack in unrelated circumstances more than 17 years earlier were unnecessary. And, we note that the administrative complaint reveals that Dr. Zack was criticized in one case for performing a more-invasive procedure without first trying a less invasive procedure; in this case Dr. Zack was *advocating* for a less invasive procedure, and thus, the consent judgment did absolutely nothing to further defense counsel's point. Rather, defense counsel introduced irrelevant evidence in violation of MRE 402 and in contravention of MRE 404(b) as other acts evidence for purposes of character assassination to taint Dr. Zack with the reek of an administrative complaint, depicting him as someone who should not be trusted because his sole motivation is to perform procedures in order to bilk insurance companies and "drive up the cost of medicine in America today." The consent judgment and administrative complaint were simply not relevant to Dr. Zack's character for truthfulness under MRE 608, nor were they relevant to his competency, knowledge, or credibility in this case.[12] See *Wischmeyer*, 449 Mich at 482.

Furthermore, even assuming *some* limited relevance of the testimony,[13] it should have been excluded under MRE 403, which provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Given that the administrative complaint contained allegations by "The State of Michigan Department of Consumer and Industry Services Office of Health Services Board of Medicine Disciplinary Subcommittee" relating to several, unrelated procedures, any marginal relevance in anything relating to the proceeding was more than substantially outweighed by the danger of unfair prejudice and jury confusion. The administrative complaint and consent judgment had

---

[12] Defense counsel used the administrative complaint much like one would seek to attack the credibility of a witness by introducing evidence of a conviction of a crime under MRE 609. However, neither the administrative complaint nor the consent judgment constitute a conviction of a crime, the alleged acts addressed therein did not entail punishment by imprisonment in excess of one year, and far more than ten years had elapsed.

[13] Had Dr. Zack previously been criticized for unnecessarily performing the same procedure at issue in this case, our resolution of the issue might be different. However, as noted, the ablation complained of in the administrative complaint was not the same as the procedure at issue in this case. Furthermore, the administrative complaint was not limited to the ablation procedure. It also included several additional, irrelevant procedures.

little bearing on anything pertinent to this case, and instead appeared to be used solely to depict Dr. Zack in a terrible light. Additionally, the allegations in the administrative complaint fault Dr. Zack for failing "to attempt to use more conservative, less expensive procedures prior to this invasive procedure." Choosing a more conservative and less invasive procedure was exactly what Dr. Zack claimed was required in the present case. The document did not impeach him; if anything, it underscored the point he was making. However, it was utilized to destroy his credibility based on irrelevant matters, and to the extent it was in any way relevant, it was unduly prejudicial.

## 2. DEFENDANT IMPROPERLY PROFFERED EXTRINSIC EVIDENCE TO IMPEACH

With respect to the administrative complaint and consent judgment, defense counsel was not only permitted to cross-examine Dr. Zack with the documents, but the trial court allowed him to admit the documents as evidence at trial. During his *de bene esse* deposition, Dr. Zack testified that he had "never been accused by a patient of ever performing an unnecessary procedure . . . ." In response, defense counsel "move[d] for the admission of" the consent judgment and administrative complaint. At trial, defense counsel argued that the documents were admissible to impeach Dr. Zack's testimony that he had not faced such accusations by a patient.[14] In other words, because defense counsel believed that Dr. Zack denied facing the accusations, defense counsel introduced the documents themselves to impeach that denial.

As defendant impliedly—and fairly—concedes in his brief on appeal, the introduction of the documents was improper under MRE 608(b). See *Wischmeyer*, 449 Mich at 478. Indeed, MRE 608(b) contains an express prohibition on proving the specific instances of the conduct of a witness by extrinsic evidence, stating that specific instances of conduct "may not be proved by extrinsic evidence" but may be inquired into on cross-examination. Here, however, defendant sought to prove what he characterized as an untruthful statement about a collateral matter by introducing documents that he believed proved the opposite of that which was asserted by the witness. Counsel should not have been permitted to introduce these documents as exhibits at trial. See MRE 608(b); *Wischmeyer*, 449 Mich at 478. In allowing the admission of the documents, the trial court erred.

---

[14] There was considerable discussion at trial about whether the complaint and consent judgment were brought about following accusations by patients complaining about the necessity of certain procedures, or whether an insurance company instigated the administrative proceedings by questioning the necessity of the procedures. During his *de bene esse* deposition, Dr. Zack testified that concerns voiced by an insurance company gave rise to the administrative complaint. There was no testimony to support defense counsel's conclusion that patients had brought about the complaint, and our review of the administrative complaint and consent judgment lend no support to defendant's conclusion. As we indicated in note 10 above, our review of the record reveals that Dr. Zack's statement that he had "never been accused by a patient" was not even impeached by the administrative complaint and consent judgment; those documents were, from the record presented, not relevant to that statement.

## 3.  REVERSAL IS REQUIRED

We conclude that these errors require reversal and a new trial is warranted because the improper impeachment of Dr. Zack was particularly damaging to plaintiff's case.  Dr. Zack was plaintiff's only expert witness, and this case essentially came down to a credibility contest between the parties' experts.  Plaintiff's theories as to why defendant breached the standard of care hinged on the jury believing Dr. Zack's testimony over defendant's expert witnesses; consequently, Dr. Zack's credibility was crucial to plaintiff's case.  While, as defendant points out in his brief on appeal, Dr. Zack had been subjected to impeachment on other issues by appropriate means, we do not agree that he had already been so impeached as to completely undermine his credibility.  The improper impeachment of Dr. Zack undoubtedly—and unfairly— undermined plaintiff's only expert in this "battle of the experts" and significantly harmed her case.

Contributing to our decision to reverse was defendant's ubiquitous use of the improper and irrelevant impeachment evidence at trial, starting with opening statement and concluding with his use of the evidence during closing arguments.  After blaming Dr. Zack for the increased cost of medical care in this country during his closing argument—a move that was no doubt aimed at inciting the jury—defense counsel read for the jury the contents of the administrative complaint, which detailed the procedures—none of which are pertinent to this case.[15]  And in discussing potential bias or interest harbored by witnesses, defense counsel returned to Dr. Zack and his unsupported assertion that Dr. Zack lied during his testimony, stating, that "a person who will deceive you on minor things . . . will deceive a person on large things too.  And [Dr. Zack] did. . . ."  In short, defendant continuously brought this irrelevant and improper impeachment evidence before the jury and used it to unfairly taint plaintiff's only expert witness.  Given the damage done to Dr. Zack's credibility and defendant's repeated references to this improper line of impeachment, taking it to an even higher level of character assassination by expressly blaming Dr. Zack for "driv[ing] up" the cost of healthcare in America by engaging in expensive and unnecessary procedures, we conclude that the errors affected a substantial right and that failure to reverse would be inconsistent with substantial justice.  See *Craig*, 471 Mich at 76.  Thus, we reverse the trial court's judgment of no cause of action and remand this case for a new trial.

## B.  QUALIFICATION OF DR. SCHUCHMAN AS A LIABILITY EXPERT

Although our disposition of the first issue results in a new trial, the other issues raised by plaintiff on appeal remain relevant with respect to the new trial, and thus, we will address them. Plaintiff contends that Dr. Schuchman was not qualified to testify in this case because he was a specialist in urogynecology and defendant was a general obstetrician/gynecologist.  In particular, plaintiff argues that Dr. Schuchman was not qualified to testify as an expert because he did not

---

[15] In his brief on appeal, defendant contends that any prejudice in this case was alleviated by the fact that the jury never saw the administrative complaint.  This argument ignores that the complaint was, in violation of MRE 608(b), admitted at trial, and that defense counsel read the details from the administrative complaint during closing argument.

spend the majority of his professional practice in the field of general obstetrics and gynecology, as is required by MCL 600.2169(1). Before trial, plaintiff moved *in limine* to exclude Dr. Schuchman's testimony on the grounds that he did not meet the specialty-matching requirement of MCL 600.2169. Defendant argued that because board certification was not available in the sub-specialty of urogynecology at the time of the alleged malpractice, Dr. Schuchman could not be considered a "specialist" in urogynecology for the purpose of MCL 600.2169. The trial court denied plaintiff's motion, stating that Dr. Schuchman's testimony that his practice was "50/50" between urogynecology and general obstetrics gynecology made the question "close enough to where it's all going to go to credibility. . . ."

We review the trial court's ruling on this issue for an abuse of discretion. *Kiefer v Markley*, 283 Mich App 555, 556; 769 NW2d 271 (2009). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Id.*

"Whether an expert may provide standard of care testimony at trial is governed by MCL 600.2169." *Jones v Botsford Continuing Care Corp*, 310 Mich App 192, 199; 871 NW2d 15 (2014). That statute provides, in pertinent part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty. [MCL 600.2169.]

The issue here is whether, "during the year immediately preceding the date of the occurrence that is the basis for the claim or action," defendant's expert "devoted a majority of his

professional time" to the "active clinical practice" of the same specialty in which defendant is a specialist.

In *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006), the Michigan Supreme Court noted that the term "specialty" is not defined in MCL 600.2169. Looking to both a general purpose dictionary and a medical dictionary, the Court defined a medical specialty as "a particular branch of medicine or surgery in which one can potentially become board certified." *Id.* See also *Jones*, 310 Mich App at 211. The pertinent time for examining the expert's specialty is the "time of the occurrence." See MCL 600.2169(1)(a); *Rock v Crocker*, 308 Mich App 155, 158; 863 NW2d 361 (2014), lv granted 497 Mich 1034 (2015).

The definition of "specialty" set forth in *Woodard* defeats plaintiff's assertion that defendant's expert was a specialist in urogynecology at the time of the alleged malpractice because urogynecology was not a field of medicine in which one could become board certified in 2010. According to Dr. Schuchman's deposition testimony, which plaintiff has not refuted, there was no recognized board certification in urogynecology at the time of the alleged malpractice in this case. Instead, according to Dr. Schuchman, 2013 was the first year for "board exams" in this area of medicine.[16] Although *Woodard* accounts for the possibility that a doctor can be a specialist in a specialty in which she is not board certified, a specialty, by definition, is a branch of medicine in which a doctor *could potentially become* board certified. See *Woodard*, 476 Mich at 561 ("[A] 'specialty' is a particular branch of medicine or surgery in which *one can potentially become board certified*") (emphasis added). See also *Robins v Garg (On Remand)*, 276 Mich App 351, 359; 741 NW2d 49 (2007) (holding that where the practice area in question was not an area where a doctor could potentially become board certified, a doctor could not be a "specialist" in that area). Dr. Schuchman could not become board certified in urogynecology at the relevant time because a board certification in urogynecology did not exist at the time of the injury that is the basis of the claim. In other words, the specialty or subspecialty of urogynecology simply did not exist for the purpose of MCL 600.2169 prior to 2013.

Both defendant and defendant's expert were board certified in general obstetrics and gynecology at the time of the occurrence. Dr. Schuchman indicated that urogynecology is a "subspecialty of gynecology."[17] He testified that after 2001 his practice consisted of 50% urogynecology and 50% "general GYN." Because urogynecology was not a recognized specialty at the time of the alleged malpractice, and in light of *Woodard*, we conclude that all of Dr. Schuchman's time was devoted to the only recognized specialty available, i.e., general obstetrics and gynecology, and that he devoted the requisite "majority" of his time to this

---

[16] We note that Dr. Schuchman's characterization comports with information obtained from the American Urogynelogic Society's website. See American Urogynelogic Society, *A Timeline of the Development of Urogynecology and Female Pelvic Medicine and Reconstructive Surgery in the US* <www.augs.org/p/cm/ld/fid=10> (accessed December 17, 2015).

[17] To the extent this could be viewed as a pronouncement that urogynecology was a specialty or subspecialty of general obstetrics and gynecology, we note that *Woodard* controls the legal definition of "specialty" for purposes of MCL 600.2169, not any statement by the witness.

practice in the year immediately preceding the date of the alleged malpractice to the active clinical practice of that specialty. See MCL 600.2169(1)(b)(*i*). Accordingly, we find no abuse of discretion in the trial court's determination that Dr. Schuchman was qualified to testify as an expert witness under MCL 600.2169.

## B. USE OF MEDICAL LITERATURE ON CROSS-EXAMINATION

Plaintiff also argues that the trial court erred in denying her motion to strike testimony referring to certain medical publications that were used on cross-examination. The trial court's decision whether to admit learned-treatise evidence for the purpose of cross-examination under MRE 707 is reviewed for an abuse of discretion. See *Lockridge v Oakwood Hosp*, 285 Mich App 678, 689; 777 NW2d 511 (2009).

At trial, plaintiff moved to strike testimony referring to certain medical publications including a journal article authored by Michael S. Baggish, M.D., the ninth edition of Te Linde's Operative Gynecology, and certain ACOG (American College of Obstetrics and Gynecology) standards. Defense counsel used the publications to cross-examine Dr. Zack. Plaintiff argued that defendant could not use the publications on cross-examination because he failed to establish that they were "authoritative" and that testimony referring to them should therefore be stricken under MRE 707. In this regard, plaintiff noted that Dr. Zack described the above materials as "reasonably reliable," "reasonably reliable reference material," and "generally reliable," but he did not believe that any of the materials were "authoritative." Defendant argued that MRE 707 only requires that publications used to cross-examine an expert witness be "reliable authority"—not authoritative. The trial court agreed with defendant and denied plaintiff's motion to strike the challenged testimony.

MRE 707 states:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

In *McCarty v Sisters of Mercy Health Corp*, 176 Mich App 593, 600-601; 440 NW2d 417 (1989), the Court stated:

> Under MRE 707, information published in a medical periodical which is established as being reliable authority by the testimony or admission of an expert witness may be used for impeachment purposes during the cross-examination of that expert witness. Dr. Brandt himself admitted that the *Obstetrical and Gynecological Survey* is "an excellent review journal," "as close to a bible as obstetricians have today," and "as reliable as anything we have in our literature." Nevertheless, he opined that the journal was not "authoritative" because everything in it could not always be considered "absolute truth." Medical or any

other authority, however, need not, and, indeed, cannot, always provide the absolute truth. Rather, as included in the definition of the word "authority" in *The American Heritage Dictionary of the English Language* (1973), an authority is "[a]n accepted source of expert information or advice, as a book or person," or as in *Webster's Third New International Dictionary* (1961), "one who is cited or appealed to as an expert whose opinion deserves acceptance." History, including the history of legal precedents, is replete with examples of the observation that, while truth is always authoritative, authority is not always true. Although authority, as the most reasoned and considered attempt at formulating and enunciating truth, may at times overshadow its object, it is nevertheless acknowledged to be a valuable source of reliable information. Dr. Brandt's praise for the *Obstetrical and Gynecological Survey* and his assessment that that periodical is "as reliable as anything we have in our literature" undermine his assertion that that periodical is not authoritative. Thus, the trial court abused its discretion in precluding plaintiff's counsel from using it for impeachment purposes under MRE 707 on the ground that its authoritative status was not admitted by the expert witness.

Based on *McCarty*, and the plain language of MRE 707, we find no merit in plaintiff's argument. MRE 707 requires only that the text used for cross-examination of an expert be "reliable authority." Here, Dr. Zack's descriptions of the materials at issue as "reasonably reliable" and "generally reliable" satisfied that requirement.[18]

We reverse and remand for a new trial. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Stephen L. Borrello
/s/ Jane M. Beckering

---

[18] Plaintiff makes a very cursory argument that defendant used learned treatises improperly. Because the argument is so brief, and because we find other grounds for reversal, we do not consider it in depth. We nevertheless note that our review of the record revealed instances where defense counsel used treatises as direct evidence of the standard of care, which violates the express parameters of MRE 707. MRE 707 allows statements contained in learned treatises to be used "*for impeachment purposes only.*"